UNITED STATES, Appellee,

v.

Herbert Alan BUTT, a/k/a Alan
Butt, Defendant, Appellant.

UNITED STATES, Appellee,

v.

James T. SEMON, Defendant, Appellant.

UNITED STATES, Appellant,

v.

Herbert Alan BUTT, a/k/a Alan
Butt, Defendant, Appellee.

Nos. 91–1227, 91–1246 and 91–1270.

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1991.
Decided Jan. 27, 1992.

See also 753 F.Supp. 44.

Michael C. Bourbeau, Hingham, Mass., with whom Robert F. Collins, Braintree, Mass., was on brief for Herbert Alan Butt.

Peter E. Ball with whom Gael Mahony and Hill & Barlow, Boston, Mass., were on brief, for James T. Semon.

Alexandra Leake, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for U.S.

Before BREYER, Chief Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

COFFIN, Senior Circuit Judge.

Herbert Alan Butt and James T. Semon, veteran officers of the Malden, Massachusetts Police Department, were convicted for offenses relating to their participation in a payoff scheme involving Malden prostitutes. Defendants argue that their sentences should be vacated and that they are entitled to a new trial. The government, in a cross appeal, challenges the district court's application of the Sentencing Guidelines to defendant Butt. We affirm in all respects, but one. Because we agree with the government that the trial court erred in sentencing Butt, we reverse and remand on this point.

## I. Facts

The facts as the jury could have found them are as follows. On October 28, 1983, Butt arrested a prostitute named Nancy Kevorkian, and a woman in Kevorkian's employ. Semon was present at the arrest. The charge against Kevorkian was dismissed. As she was leaving the police station, Semon gave her his business card and informed her that some prostitutes were permitted by the police to work free from the threat of arrest. Shortly afterwards, defendants and Kevorkian met at a local restaurant, and the two policemen advised Kevorkian that if she stayed away from drugs, guns, and pimps, they would not arrest her or those in her employ. In February 1984, they called another meeting with Kevorkian at the same restaurant. They informed her that if she wished to keep working in Malden she would have to start making weekly payments to the officers. The chief of the Malden Police Department, they told her, had suggested a rate of five hundred dollars a week, but they had managed to talk him down to three hundred.

The following Friday, and virtually every Friday thereafter for four years, Kevorkian met Butt and Semon, usually at the same Malden restaurant. After breakfasting with them, Kevorkian would sit with defendants in their car and leave an envelope containing three hundred dollars in cash in the back seat.[1]

In 1986, Kevorkian began to weary of her business and to consider closing it down. She discussed her feelings with defendants, who encouraged her to take a vacation if she needed a break, but to continue working, since, according to Butt, they needed the payoff money. In January 1988, Kevorkian's business began to falter and she sought to reduce the payments to the officers. Butt agreed to a reduction to two hundred dollars a week, since Semon had taken ill and was off the illegal payroll. Thereafter Kevorkian dealt only with Butt. Kevorkian closed down her prostitution business in September 1988, a few weeks after Butt had informed her that increased scrutiny of police operations prevented him from receiving any more payoffs in exchange for police protection.

An indictment returned on March 27, 1990 charged Butt with conspiracy to extort money from prostitutes through fear of economic harm and under color of official right, in violation of the Hobbs Act, 18 U.S.C. § 1951, and with actual extortion in violation of 18 U.S.C. §§ 1951 and 2, with conspiracy to commit racketeering in violation of the Racketeer Influenced and Corrupt Organizations statute (RICO), 18 U.S.C. § 1962(d), and with the substantive RICO offense under 18 U.S.C. § 1962(c). Semon was charged with two counts of perjury in violation of 18 U.S.C. § 1623, for lying to the grand jury about his knowledge of and participation in the payoff arrangement with Kevorkian.

1. Two other Malden area prostitutes, Carmen Chaves and Donna Adkerson Hall, participated in a similar payoff scheme with Semon and Butt between 1984 (or 1983) and 1987.

Following a fourteen-day trial, the jury returned guilty verdicts against both defendants on all counts. Butt and Semon were sentenced to prison terms of thirty and eighteen months, respectively.

We turn now to defendants' claim that they are entitled to a new trial.[2]

## II. Nancy Kevorkian's Psychiatric History

Defendants argue that the district court committed reversible error in a series of rulings regarding Nancy Kevorkian's psychiatric history.

### A. *Background*

On May 8, 1990, Magistrate Judge Collings ordered the government to make available the psychiatric records of its witnesses "to the extent that ... the records tend to call into question th[e] ability of the witness to perceive events accurately and/or to recount those events truthfully and accurately at a later time." At a subsequent motion hearing, the government learned from Butt that its key witness, Kevorkian, had attempted suicide in 1987 and that she had been hospitalized and examined by a psychologist as a result.

The government discussed the incident with Kevorkian and concluded that the contents of the psychological report were not within the scope of the magistrate judge's order, since her suicide attempt was the result of depression, rather than any disorder that might alter her ability to perceive events or to recount those perceptions at a later time. Kevorkian's attorney, David Kelston, obtained a copy of the psycho-

gist's report and was of the opinion that it was not exculpatory. The government declined to review the report, considering it to be private and potentially privileged.[3] It requested, instead, that the district court determine *in camera* whether the report fell within the terms of the disclosure order.

On November 26, 1990, the first day of trial, the district court announced that it had reviewed Kevorkian's hospitalization records *in camera* and that it was disposed not to release them, finding "nothing ... exculpatory or potentially exculpatory." However, the court directed defense counsels' attention to two terms appearing in Kevorkian's medical report, "splitting" and "hysteroid dysphoric," and invited briefing from defendants on whether the terms indicated a disorder "affect[ing] the ability of someone to comprehend and properly testify" or "a person's ability properly to respond to questions."

Semon submitted two affidavits from a psychiatrist, Dr. Alan Green, commenting upon the meaning of the terms "splitting" and "hysteroid dysphoria" and suggesting that access to the report could be helpful to defendants. The court agreed to provide defense counsel with the portions of the report containing those terms and another, "borderline personality disorder," but denied Semon's motion for additional disclosure of the document on grounds that the information requested was not relevant and would not be admissible at trial.

The defense renewed its request for further disclosure at the conclusion of the government's case. Defendants also

---

**2.** We have considered and find meritless defendants' claim that the trial court's instruction on the "effect on interstate commerce" element of the Hobbs Act and RICO crimes was in error. The district court advised the jury that, in order to convict, it must find the extortionate transactions charged to have had a "minimal, slight or subtle effect" on interstate commerce. It is well settled that "a realistic probability of a de minimis effect on interstate commerce" is all that need be shown to establish federal jurisdiction over extortionate crimes affecting interstate commerce. *United States v. Rivera–Medina,* 845 F.2d 12, 15 (1st Cir.1988); *see also United States v. McKenna,* 889 F.2d 1168, 1171–72 (1st Cir.

1989). Because faithful to this standard, the challenged instruction produced no error.

**3.** We do not address the question of whether the report was "privileged" under the federal rules of evidence. *See United States v. Barrett,* 766 F.2d 609, 616 (1st Cir.1985) (leaving open question of whether federal rules recognize psychotherapist-patient privilege). Neither the government nor defendants pressed the issue with particular force before us or in the district court. More importantly, the trial court appears not to have based its evidentiary rulings upon the existence or absence of such a privilege. *See infra* at 81–83.

sought to call a psychiatrist, Dr. Martin Kelly, to testify to the meaning of the psychological terms appearing in the redacted version of the report. The court again denied defendants' disclosure request. As well, it ruled the redacted copy of the report inadmissible and barred the expert testimony.

Defendants claim the court erred in three ways with respect to Kevorkian's psychological evaluation: (1) in denying defendants further access to the hospitalization report and in refusing to admit into evidence the redacted version; (2) in barring expert testimony on the significance of the psychological terms contained in the redacted copy of the report; and (3) in failing to provide an adequate opportunity for cross-examination of Kevorkian. We shall discuss each in turn.

B. *Disclosure/Admission of the Report*

Defendants claim that the district court erred in disclosing only a small part of Kevorkian's hospitalization report and in excluding the disclosed portions from evidence. They claim that this evidence was relevant and admissible because it would have demonstrated that Kevorkian was both biased and unable to perceive or tell the truth. We address these arguments separately.

1. Bias

■ The thrust of the defense at trial was that no payoff scheme existed between defendants and Kevorkian or any other prostitute, and that Kevorkian, and those witnesses purporting to corroborate her testimony, were lying. According to defen-

dants, Kevorkian's medical records were relevant evidence of her motive to lie about defendants' role in the payoff scheme. Defendants contend that her "hysteroid dysphoria" and "potential for splitting" caused her to harbor an irrational hatred of Butt and Semon, which drove her to testify falsely about them.

In so arguing, defendants relied upon the affidavits of their expert, Dr. Alan Green. Green informed the district court that hysteroid dysphoric individuals who employ splitting "may idealize others and then quickly devalue them when they feel any hint of rejection." [4] Defendants argued that Kevorkian experienced an emotional backlash consistent with this profile, and that her testimony was concocted to punish them for dashing her "magical expectations." The district court was not persuaded. Finding no support for defendants' bias theory, and, in particular, no evidence of any "triggering" rejection of Kevorkian by defendants, the court ruled Kevorkian's psychiatric history not relevant to her motivation to testify.[5]

District courts have considerable discretion in determining the relevancy of evidence, and this discretion must be respected absent abuse. *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir. 1987); *see also United States v. St. Michael's Credit Union*, 880 F.2d 579, 601 (1st Cir.1989). We find no abuse here.

Defendants produced no convincing evidence that Kevorkian's testimony was fabricated to avenge imaginary insults, or, indeed, that it was fabricated at all. Kevorkian took the stand pursuant to an im-

---

**4.** Green stated that "Hysteroid Dysphoria" is a term sometimes used to describe a depressed person "who manifests his or her depression in a dramatic or attention seeking way." Persons who experience "splitting," he explained, may suffer from "severe personality disorders." They tend to separate others "into groups of those who are all good and those who are all bad." Such individuals "may not be psychotic, but may distort what they experience in order to reconcile reality with their fantasized perception of others."

**5.** We find the district court's suggestion, on December 5, 1990, that the report might "bear on

[Kevorkian's] bias," to be of no consequence in light of its repeated contrary findings. On November 29, 1990 the court stated that "none of [the report] seem[ed] relevant to anything having to do with this case;" on December 5, it observed "nothing in [either the redacted or the unredacted portions of the report] ... which bears the slightest relationship, mention of, [or] concern about either of these two defendants. The people mentioned are her boyfriend, concerns about her profession, health concerns...."; and on December 17, at the last of the evidentiary hearings, the court affirmed this conclusion virtually verbatim.

munity and compulsion order. She stated that she was testifying against Butt and Semon because she had been subpoenaed to do so, and that she felt no animosity toward them. Undisputed evidence demonstrated that a close, personal relationship existed between Kevorkian and defendants. Kevorkian testified that she viewed their friendship as unwavering, from late 1983 on, and defendants produced no persuasive evidence to the contrary.

Defendants sought to convince the district court that certain discrepancies in Kevorkian's testimony demonstrated a growing vindictiveness toward them. They relied upon three examples. The first was that Kevorkian apparently told an FBI agent, at the outset of the government's investigation, that she and Semon had sex once, and then testified at trial that they had sex twice. It is not at all clear, though, that Kevorkian's testimony shifted on this point. It appears that when questioned by the FBI, Kevorkian stated that she and Semon had sex, without specifying the number of times, and that the agent, paraphrasing her remark, reported it as once. Her trial testimony, therefore, as readily corroborates as it does contradict her earlier statement.

The second example cited by defendants was that Kevorkian told the FBI that both defendants threatened her with violence lest she publicize the payoff arrangement, but testified at trial, months later, that only Semon threatened her. This inconsistency is less stark than defendants suggest. At trial, Kevorkian stated that while Semon uttered the threats, Butt was present whenever they were made. Her earlier assertion that both defendants threatened her—again, as paraphrased by the FBI agent—arguably reflects nothing more than this.

Finally, defendants maintained that the absence of any evidence of threats from certain audio tapes made by Kevorkian of conversations between her and defendants proves that the threats did not occur, but were, instead, recently contrived consistent with defendants' theory of her growing bitterness. Yet these tapes were made during the later phase of the payoff scheme, when, quite plausibly, Kevorkian had proved herself capable of keeping defendants' secret and the need for threats had dissipated.

At best, these examples are of minor significance. Without doubt, they are an insufficient basis for our finding abuse.

## 2. Credibility

■ The district court found Kevorkian's hospitalization report of 1987 not relevant to her credibility, despite the suggestion contained therein that she was mentally unstable at a time covering events about which she later testified. Defendants, relying on longstanding precedent that evidence of mental instability is relevant for purposes of impeaching a government witness, argue that the court abused its discretion in deeming Kevorkian's medical history irrelevant.

■ For over forty years, federal courts have permitted the impeachment of government witnesses based on their mental condition at the time of the events testified to. *See United States v. Hiss,* 88 F.Supp. 559, 559–60 (S.D.N.Y.1950). Evidence about a prior condition of mental instability that "provide[s] some significant help to the jury in its efforts to evaluate the witness's ability to perceive or to recall events or to testify accurately" is relevant. *United States v. Moore,* 923 F.2d 910, 913 (1st Cir.1991). "The readily apparent principle is that the jury should, within reason, be informed of all matters affecting a witness's credibility...." *United States v. Partin,* 493 F.2d 750, 762 (5th Cir.1974). *See also United States v. Lindstrom,* 698 F.2d 1154, 1165–66 (11th Cir.1983).

Despite this precedent, we are aware of no court to have found relevant an informally diagnosed depression or personality defect. Rather, federal courts appear to have found mental instability relevant to credibility only where, during the timeframe of the events testified to, the witness exhibited a pronounced disposition to lie or hallucinate, or suffered from a severe illness, such as schizophrenia, that dramati-

cally impaired her ability to perceive and tell the truth.[6]

In *United States v. Barrett*, 766 F.2d 609, 615–16 (1st Cir.1985), for example, the jury heard evidence that the government's star witness had once been "sufficiently agitated, psychotic, and delusional" to have been prescribed a dose of medication typically recommended for those who "confuse fact and fantasy," and that the witness had been taking this medication up until one or two weeks prior to trial. In *Partin*, where the exclusion of a government witness's psychiatric history produced reversible error, the witness had voluntarily committed himself to a psychiatric hospital a few months prior to the events about which he testified, experiencing auditory hallucinations and believing himself to be another person. 493 F.2d at 764. Similarly, in *Hiss*, the government's key witness was allegedly a psychopathic personality disposed to "chronic, persistent and repetitive lying ... acts of deception and misrepresentation ... and a tendency to make false accusations." *In re Hiss*, 542 F.Supp. 973, 993 (S.D.N.Y.1982) (describing mental condition of government witness in *Hiss*, 88 F.Supp. 559), *aff'd without opinion*, 722 F.2d 727 (2d Cir.1983). And in *Lindstrom*, medical records showed that a government witness had manipulated the results of a medical test and woven an "intricate fabrication" to explain it, that the witness "chronically misinterpret[ed] the words and actions of others," and that she exhibited "pseudoneurotic schizophrenia with marked paranoid trends," 698 F.2d at 1164–65.

Defendants do not suggest, nor is there evidence to the effect, that Kevorkian was disposed to the sorts of hallucinations, false accusations, or distortions present in these cases. Her psychiatric history consists of a single report based on one inter-

view following her suicide attempt in 1987. The disclosed sections of the report find "no evidence of psychotic thinking." They describe Kevorkian as "an angry and alert individual" suffering from "atypical depression" and "borderline personality disorder", namely, "hysteroid dysphoria" with a "marked potential for splitting." As well, they report "indications ... of considerable rejection sensitivity ... very poor personal judgment ... [and] impulsivity and despair...."

The district court was impressed, as are we, by the absence of a formal psychiatric diagnosis or of any "diagnosis ... of a mental illness which [would] prevent[ ] [Kevorkian] from perceiving matters truthfully and testifying about them." After reviewing the report in its entirety, as well as observing Kevorkian on the witness stand for two days, the trial court was of the opinion that she was "not mentally incapacitated in any way." It found no evidence of "paranoid fantasies" and concluded that her depression, as described by the examining psychologist in 1987 and as speculated upon by Dr. Green, was "a condition ... within the norm."[7]

We find nothing improper in the trial court's management of this delicate question. Having examined the 1987 report in full, ourselves, we find the court's assessment of it to have been fair. Admittedly, we cannot rule out the possibility of any relationship between Kevorkian's past mental health and her credibility at trial. Her depression may well have colored her perception of reality. The same may be said, though, of most of life's ordeals and of the painful and embarrassing ones, in particular. In ruling Kevorkian's psychological profile not relevant to her veracity, the trial court evidently concluded that a tight-

---

**6.** Even the scholarly authority relied upon by defendants and by the *Lindstrom* court purports to limit the relevancy rule to serious mental illness. *See Lindstrom*, 698 F.2d at 1160 (emotional or mental defects that may affect the accuracy of testimony include "the psychoses, most or all of the neuroses, defects in the structure of the nervous system, mental deficiency, alcoholism, drug addiction and psychopathic personality" (quoting Juviler, *Psychiatric Opin-*

*ions as to Credibility of Witnesses: A Suggested Approach*, 48 Cal.L.Rev. 648, 648 (1960)).

**7.** In light of these conclusions, we find of no import the district court's single reference, at the November 29 hearing, to "the possibility that ... [Kevorkian] ... had at some stage some sort of recognizable psychological profile which psychologists would say could bear upon her perceptions of reality."

er logical nexus was necessary to justify the introduction of such personal and potentially stigmatizing material. While recognizing that another court might have ruled differently, we are unable to find that the district court in this case abused its broad discretion in holding as it did.

### 3. Rule 404(a) [8]

An additional aspect of defendants' relevancy argument needs to be addressed. According to defendants, the district court's relevancy ruling was predicated upon its judgment that Kevorkian's psychiatric history was "per se inadmissible 'character evidence.' " Were we to concur in defendants' characterization, we might well be inclined to find reversible error. In our view, however, the district court based its exclusion of the contested evidence not upon a "per se" rule, but, rather, upon its carefully considered findings that Kevorkian's medical history was not relevant to any issue in the case.

To the extent that the court did rely upon Rule 404's proscription of character evidence, it explicitly considered the exception, contained within the rule, for evidence of a witness's character for truthfulness.[9] Thus, rather than making the sort of categorical judgment described by defendants, the district court simply determined that the proffered evidence did not bear upon Kevorkian's veracity. We therefore find no error.

### 4. Remaining Issues

■ Our affirmance of the trial court's relevancy determination disposes of defendants' claim that the trial court erred in barring full or additional disclosure of Kevorkian's 1987 hospitalization report. A district court's determination regarding compliance with a discovery order is committed to its sound discretion and is reversi-

ble only for abuse. *United States v. Tejada*, 886 F.2d 483, 486 (1st Cir.1989). The order of the magistrate judge required the government to make available to the defense the psychiatric records of government witnesses so far as they "tend[ed] to call into question the ability of a witness to perceive events accurately and/or to recount those events truthfully and accurately at a later time." The trial court, having ruled Kevorkian's medical records not relevant to her truth-telling ability or any other issue, was free to limit their discovery. *See United States v. Sterling*, 742 F.2d 521, 527 (9th Cir.1984) (upholding district court's non-disclosure of government witness's psychiatric records after *in camera* review on ground that evidence would not be admissible at trial).

As for defendants' attack upon the court's decision to review the report *in camera*, we suspect that it has been waived. Shortly before trial the government moved for *in camera* review. The court granted the motion one week later. So far as we can see, defendants did not object to the order and made no motion for reconsideration. Such inaction, particularly within days of the commencement of trial, presumably precludes defendants from challenging the order before us. *See Reilly v. United States*, 863 F.2d 149, 160 (1st Cir.1988) (when "a trial judge announces a proposed course of action which litigants believe to be erroneous, [and] the parties detrimentally affected ... [fail to] act expeditiously to call the error to the judge's attention," right of appeal is waived).

Assuming, without deciding, that defendants' claim is viable at this stage, it cannot succeed. We accord the district court broad discretion in protecting the rights of parties through the use of *in camera* review of a witness's medical history. *See*

---

**8.** Fed.R.Evid 404(a)(3) prohibits "[e]vidence of a person's character or a trait of character ... for the purpose of proving action in conformity therewith on a particular occasion, except ... as provided in rule[ ] ... 608...." Rule 608(a), in turn, permits evidence "referring to character for truthfulness or untruthfulness...."

**9.** *See supra* note 8. On December 17, 1990, the court, referring to both the hospitalization report and defendants' proffered expert testimony, stated "I don't think that this is the type of ... evidence which is admissible under 404(a)(3) when read in conjunction with Federal Rule 608."

*United States v. Grey Bear,* 883 F.2d 1382, 1393 (8th Cir.1989) (*in camera* review of witness's medical records permissible exercise of discretion where direct and cross-examination of witness elicited the relevant information); *Sterling,* 742 F.2d at 527 (no abuse of discretion where trial court refused to grant defendant access to government witness's psychiatric records on ground that evidence would not be admissible at trial, choosing, instead to conduct *in camera* review). Given the court's pre-trial decision to disclose to defendants what, in our estimation, were the most salient portions of the report, we find no abuse here.

## C. *The Expert Testimony*

■ Defendants also sought to educate the jury about Kevorkian's psychiatric history by calling a psychiatrist to testify to the significance of the terms "hysteroid dysphoria," "splitting," and "borderline personality disorder." [10] The district court barred the proffered testimony, finding that it was not relevant to any issue in the case and amounted to a general, and therefore impermissible, attack on Kevorkian's credibility in violation of Rule 404(a).[11] The court also suggested that the testimony would not assist the jury in the manner contemplated by Fed.R.Evid. 702,[12] but, rather, would undermine its ability to assess Kevorkian's credibility.

■ A trial judge has wide discretion concerning the admission of expert testimony, and we sustain such decisions where there has been no abuse. *Peckham v. Continental Cas. Ins. Co.,* 895 F.2d 830, 837 (1st Cir.1990). In our view, the district court did not abuse its discretion here. The expert testimony consisted of Dr. Green's explanation of the terms "hyster-

oid dysphoria," "splitting," and "borderline personality disorder" as they are understood by the psychiatric profession. Neither of defendants' experts had met Nancy Kevorkian and, consequently, neither was prepared to comment professionally upon her mental health, particularly as it may have been in 1987. In addition, nowhere in the record is it suggested that defendants' experts had reviewed any of Kevorkian's grand jury or trial testimony, or had any opinion about her current ability to perceive and tell the truth.

Quite apart from the fact that the expert testimony bore no relation to Kevorkian, personally, is the necessarily tentative nature of its conclusions. It defines psychological terms as a medical textbook might, listing a group of characteristics suggestive of "borderline personality disorder" and sketching for the layman a profile of the typical hysteroid dysphoric person inclined toward "splitting." The testimony describes tendencies only, cataloging a range of behavior that one so diagnosed might or might not, sometimes, exhibit.

The bearing of these generalizations upon Kevorkian, personally, is questionable, in the extreme. The risk of their injecting collateral and confusing questions into the proceedings and subverting the jury's credibility determination, on the other hand, was considerable. In addition, to the extent that the testimony was, in effect, little more than a verbal rendition of the disclosed portions of the 1987 hospitalization record, it, too, was excludable on relevancy grounds. *See supra,* at 81–83.

## D. *Cross Examination: The Confrontation Clause*

In barring Kevorkian's medical records and the observations of defendants' expert

---

**10.** Defendants sought to call Dr. Kelly, rather than Dr. Green, to testify as their psychiatric expert. Dr. Kelly's remarks were to have been "similar in substance" to those contained in the two affidavits by Dr. Green. The district court's admissibility ruling was based upon its assessment of Green's affidavits and we focus our attention on them.

**11.** The court ruled that the testimony was not "proof ... in the sense that we normally consider relevance [sic] in any trial;" that it "d[id]n't

establish or undercut any matter at issue in this trial," and that it was not evidence of Kevorkian's character for truthfulness within the meaning of Rules 404(a)(3) and 608, *see supra* note 9.

**12.** Rule 702 allows testimony in the form of an expert opinion where "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...." Fed.R.Evid. 702.

from evidence, the trial court noted that "proper cross-examination will give this lay jury a good feel for this woman. And if in fact she turned on these particular individuals and fabricated [her account of defendants' participation in the payoff scheme,] ... the normal engine of truth discovery will obtain." Before us, defendants argue that no opportunity for "proper cross examination" was afforded them, and that, as a result, their rights under the United States Constitution were violated.

 The Sixth Amendment guarantees criminal defendants an adequate opportunity to cross-examine adverse witnesses. *United States v. Owens,* 484 U.S. 554, 557, 108 S.Ct. 838, 841, 98 L.Ed.2d 951 (1988); *United States v. Berrio–Londono,* 946 F.2d 158, 160 (1st Cir.1991). And a government witness's psychiatric history is, under certain circumstances, a proper subject of cross-examination. *United States v. Rivera–Santiago,* 872 F.2d 1073, 1084 (1st Cir. 1989). The right to cross-examination is not absolute, however. *Berrio–Londono,* 946 F.2d at 160. The confrontation clause guarantees " 'an *opportunity* for effective cross-examination, not cross-examination ... in whatever way, and to whatever extent the defense might wish.' " *United States v. Noone,* 913 F.2d 20, 32 (1st Cir. 1990) (quoting *Owens,* 484 U.S. at 559, 108 S.Ct. at 842) (citation omitted). "Once the defendant has been afforded a reasonable opportunity to question a witness' veracity and motivation, the trial judge enjoys broad discretion in determining the scope and extent of cross-examination...." *Berrio–Londono,* 946 F.2d at 160 (quoting *United States v. Garcia–Rosa,* 876 F.2d 209, 237 (1st Cir.1989)).

 We consider first whether defendants were given an adequate or reasonable opportunity to examine Kevorkian. Before her cross-examination began, the government moved to prevent the defense from asking Kevorkian about any aspect of her psychiatric history. The district court refused the government's broad request, ruling that the defense was ·free to inquire about Kevorkian's psychological background—"the nature of how she was feeling and her psychological problems generally"—including her suicide attempt, hospitalization, and the contents of the psychologist's report, as far as she had discussed them with defendants.[13] The court expressly held out the possibility of broadening this approach, proposing to reassess its initial ruling on a question by question basis and adding that, should Kevorkian affirm any aspect of her psychiatric history, "maybe we can go further."

Defendants chose not to exercise this option. During the more than two days of cross-examination, they asked Kevorkian not one question about her psychological difficulties.[14] In light of this, we are perplexed by defendants' contention that the court's order violated their constitutional rights. In our view, defendants were afforded a more than adequate opportunity to examine Kevorkian.

As for the trial court's limiting the scope of examination to matters discussed by Kevorkian with defendants, on this record we cannot find abuse. The court explicitly offered to revise its initial ruling, depending upon Kevorkian's responses to questions about her mental health. That defendants posed no such questions precludes them from arguing any impropriety to us.[15] In

**13.** The record reflects that Kevorkian had discussed her depression and her suicidal thoughts with defendants, who apparently encouraged her to seek professional help. Indeed, it was Butt who alerted both the government and the district court to Kevorkian's suicide attempt in the first place.

**14.** Defendants managed, however, to elicit an array of evidence bearing upon her credibility, generally. Kevorkian admitted that she had lied to IRS investigators, that she had participated in a mail fraud scheme, money launder-

ing, and the interstate transportation of stolen vases, and that she had committed tax evasion.

**15.** Defendants also contest the trial court's refusal to permit cross-examination of Nicholas Lupoli, the superintendent of an apartment building in which Kevorkian had worked, on the subject of whether he was a male prostitute. Defendants sought to prove that Lupoli fabricated his testimony in an effort to placate the government and, so defendants argue, escape prosecution for his crimes. Lupoli represented to the court that he did not wish his homosexu-

sum, defendants received their due under the Sixth Amendment.[16]

### E. *Conclusion*

While the disclosure and admission of Kevorkian's psychiatric history presented the district court with a series of thorny decisions, we believe that defendants received a fair trial. In so ruling, we recognize that the district court's evidentiary rulings were highly discretionary, particularly given the pivotal role assumed by Kevorkian's credibility in this case. But, although the suppression of Kevorkian's psychiatric records and the expert testimony curtailed defendants' impeachment of Kevorkian, we find that by granting defendants partial disclosure of Kevorkian's medical records and permitting them some leeway to cross-examine her about her mental health—as well as expressing a willingness to "go further"—the trial court afforded defendants an adequate opportunity to exploit Kevorkian's psychiatric history before the jury.

We turn now to the sentencing issues presented by this case.

### III. The Sentences [17]

### A. *James T. Semon: Interference With Justice*

Semon's perjury convictions rested upon his having lied to the Grand Jury about his knowledge of and participation in the payoff arrangement with the Malden area prostitutes. Semon denied that he had taken payoffs and he denied knowing that his co-defendant, Butt, had taken such payoffs. The guideline under which Semon was sentenced provides for a three-level increase in the sentence "[i]f the perjury or subornation of perjury resulted in substantial interference with the administration of justice...." U.S.S.G. § 2J1.3(b)(2). Finding that Semon's perjury did produce such interference, the trial court enhanced his sentence accordingly. Semon challenges this decision on the merits and on grounds of default.

### 1. Default

■ The government did not inform Semon or the trial court of its intent to seek the § 2J1.3(b)(2) enhancement until the morning of Semon's sentencing. Semon contends, and we agree, that the sentencing guidelines do not favor such eleventh hour applications. To the contrary, they explicitly encourage the "narrowing and resolution ... of issues in dispute in advance of the sentencing hearing...." U.S.S.G. § 6A1.2, p.s.

Whether the tardiness of an application for enhancement constitutes default, or waiver, however, is a separate and far more controversial matter. It is, moreover, one that we need not decide. Sensitive to the potential for unfairness occasioned by the government's delay, the district court offered to postpone the proceedings so that Semon might have additional time to brief the enhancement issue. Semon declined the court's invitation in the interest of bringing to an end the uncertainty surrounding his sentence. He informed the court that he was familiar enough with the pertinent case law to argue the matter and

---

ality to become public, and the court barred defendants' questions as unfairly prejudicial under Fed.R.Evid. 403. While another court, conceivably, might have ruled differently, we are unable to find that the court abused its discretion in the instant case. *See United States v. Hadfield,* 918 F.2d 987, 994–95 (1st Cir.1990) (Rule 403 balancing of probative value and prejudicial effect reviewable for abuse of discretion).

**16.** Butt asserts that the trial court's exclusion of Kevorkian's medical record and the expert testimony violated his right to confront Kevorkian. He does not brief this issue, but, instead, adopts the arguments of co-defendant Semon, which were not characterized in terms of the confrontation clause. We have already answered Semon's challenges to the evidentiary rulings and see no basis for revisiting them under the confrontation clause.

**17.** The trial court, exercising leniency at the jury's request, sentenced Butt and Semon to thirty and eighteen month prison terms, respectively, and recommended that Semon be released to home detention after serving ten months of his term, because of his poor health.

All parties agree that the sentencing guidelines, as amended November 1, 1990, are applicable to both defendants.

proceeded to do so. In our view, Semon thereby waived any basis for appealing the district court's decision to consider the government's application.

### 2. The Merits

■ Semon also challenges the trial court's judgment that his perjury did, in fact, interfere with the administration of justice within the meaning of § 2J1.3(b)(2). He complains that his "simple and straightforward" lies were not sufficiently egregious to trigger the enhancement.

The government represented to the district court that Semon's denials before the Grand Jury in April 1989 needlessly complicated its investigation and prosecution. Had Semon admitted his involvement at the outset, the government arguably would not have needed to locate all three of the prostitutes who testified about receiving police protection from Butt and Semon in exchange for weekly payments, or the several witnesses who corroborated this testimony. With fewer witnesses to examine, the government, presumably, would have been spared time and expense at trial. Perhaps most important, had Semon testified truthfully, the government might not have immunized persons whom it otherwise could have prosecuted.

Even were we to accept Semon's premise that his perjury was less obstructive than that deemed worthy of enhancement by other courts, see *United States v. Lueddeke*, 908 F.2d 230 (7th Cir.1990); *United States v. Barnhart*, 889 F.2d 1374 (5th Cir.1989)—and we make no such ruling—we would not, without more, be disposed to reverse the district court's determination. We review a sentencing court's application of the guidelines to the facts before it for clear error, only. 18 U.S.C. § 3742(e); *United States v. Rodriguez–Cardona*, 924 F.2d 1148, 1155 (1st Cir.1991). Commentary to § 2J1.3(b)(2) specifically includes "the unnecessary expenditure of substantial governmental or court resources" within the definition of "substantial interference with the administration of justice," § 2J1.3(b)(2) comment. (n. 1). And the

government need prove the relevant facts only by a preponderance of the evidence, for purposes of applying the sentencing guidelines. *Rodriguez–Cardona*, 924 F.2d at 1155. We find no error here.

### B. *Herbert Alan Butt*

#### 1. Abuse of Public Trust

■ Butt was sentenced for his Hobbs Act and RICO violations under U.S.S.G. § 2E1.1, "Unlawful Conduct Relating to Racketeer Influenced and Corrupt Organizations." That guideline provides:

(a) Base Offense Level (Apply the greater);

(1) 19; or

(2) the offense level applicable to the underlying racketeering activity.

Commentary to the provision states that to determine which offense level is greater, applicable adjustments, set forth in Chapter Three of the guidelines, are to be added to each. § 2E1.1, comment. (n. 1).

The government and Butt agreed that the underlying racketeering activity of which Butt was convicted, for purposes of subsection (a)(2), was "extortion under color of right," which carries a base offense level of ten.[18] The parties then proceeded to add to "19" and "10" the applicable Chapter Three adjustments. One such adjustment, U.S.S.G. § 3B1.3, imposes a two-level increase "[i]f the defendant abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission ... of the offense." The provision contains an exception clause, stating that "[t]his adjustment may not be employed ... if an abuse of trust or skill is included in the base offense level or specific offense characteristic." § 3B1.3.

The parties agreed that abuse of public trust was an element of the offense of extortion under color of right, and that the § 3B1.3 adjustment therefore should not be added to the base offense level of ten, under § 2E1.1(a)(2). Their disagreement arose as to whether the RICO offense level

---

**18.** *See* U.S.S.G. § 2C1.1(a).

prescribed in subsection (a)(1) also included the abuse of trust element.

Troubled by what it viewed as the prospect of double counting, and adverting to "equitable" and "viscerally appealing" arguments, the district court held that it did. Reasoning that Butt's status as a police officer was as intrinsic to his RICO convictions as it would be to an extortion under color of right conviction, the court concluded that subsection (a)(1) must, like subsection (a)(2), engage the § 3B1.3 limitation. In addition, the court believed that the structure of § 2E1.1—requiring a comparison of calculations made under the two subsections—meant that a sentence under subsection (a)(1) necessarily would include the underlying racketeering activity. Thus, the adjustment for abuse of trust would not apply to (a)(1) if it did not apply to (a)(2).

The government contends that the trial court's construction of §§ 2E1.1 and 3B1.3 was erroneous. *See* 18 U.S.C. § 3742(b) (government may appeal sentence on ground that district court incorrectly applied sentencing guidelines). The issue is both complex and technical. We wholly understand and sympathize with the district court's efforts to avoid a double-acting effect. Yet, after careful consideration of this matter, we are persuaded by the government's arguments.

By incorporating the "underlying racketeering activity" into subsection (a)(1), the trial court treated subsection (a)(1) as nothing more than a short-hand variant of (a)(2). In so doing, it undermined the logic of § 2E1.1.

The base offense level prescribed by the guidelines for a particular crime presumably reflects, or "includes," those characteristics considered by Congress to inhere in the crime at issue. In the case of extortion under color of right, abuse of trust would be one such characteristic, since Congress could reasonably have determined that every act of extortion under color of right involves an abuse of public trust. Because the RICO statute, by contrast, can be violated in innumerable ways, there are, arguably, no offense characteristics common to all RICO offenses. We believe it appropriate, therefore, to take the base offense level set forth in § 2E1.1(a)(1) as one finds it—as establishing a *generic* base offense level for RICO crimes, one that "includes" no particular offense characteristic or special skill. *See United States v. Dempsey*, 768 F.Supp. 1277, 1281 (N.D.Ill.1991) (base offense level in § 2E1.1(a)(1) reflects legislative judgment "that RICO is a specific, identifiable crime apart from any underlying predicates").

The reference to specific "underlying racketeering activity" in subsection (a)(2) does not require a contrary reading. Subsection (a)(1), as we understand it, establishes a minimum base offense level (nineteen) for RICO violations. This minimum reflects a legislative judgment that RICO violations—because entailing not one criminal act, but a pattern of predicate crimes—warrant a higher base offense level than do non-racketeering offenses. *See Dempsey*, 768 F.Supp. at 1281. ("[I]t is both logical and correct that the Sentencing Commission chose a specific offense level for RICO which punishes such activity more harshly than ... nonrepetitive criminal conduct."). The comparison between subsections (a)(1) and (a)(2) mandated by § 2E1.1 merely ensures that a RICO defendant will not receive a *lesser* sentence than would attach to the underlying acts, simply by virtue of his having committed them in furtherance of a racketeering scheme.

Properly understood as a universal base offense level for RICO violations, implying no specific offense characteristics, subsection (a)(1) cannot be read to "include" abuse of trust. It, therefore, does not fall within the limitation of § 3B1.3, and applying the abuse of trust adjustment to the subsection (a)(1) calculation produces no double counting. *See Dempsey, id.* at 1283.

Because there appears to be no disagreement that Butt, as a police officer, abused the public trust in perpetrating the racketeering scheme of which he was convicted, the district court ought to have granted the government's request for the § 3B1.3 ad-

justment. Its failure to do so was error. Butt's sentence accordingly must be vacated and recalculated.

To ensure proper application of the guidelines on remand, clarification of one further point is necessary. Contrary to the district court's statement at the disposition hearing, the Chapter Three adjustments are added to *both* the subsection (a)(1) and (a)(2) offense levels. *See* § 2E1.1, comment. (n. 1). We therefore concur in the government's determination that the applicable base offense level under subsection (a)(1) is twenty-one (nineteen plus the two level adjustment for abuse of trust), rather than nineteen, as the district court suggested.

### 2. The Downward Departure

 Butt appeals the district court's refusal to grant him a downward departure under U.S.S.G. § 5K2.0 based upon the discrepancy between his prison term (thirty months) and that of Semon (eighteen months).[19] His argument rests on the extraordinary contention that a departure is necessary to correct for alleged prosecutorial impropriety in the framing of the indictment, to wit, the decision to charge only Butt with the RICO and Hobbs Act offenses. Butt maintains that the evidence at trial established that he and Semon were equally culpable for the extortion and racketeering, notwithstanding the fact that Semon was neither charged nor convicted of these crimes.

At disposition, the district court concluded that since Butt and Semon each were sentenced under the guideline applicable to the offense of conviction, neither the fact of a disparity in the resultant prison terms, nor Butt's allegations of unfair prosecution, afforded a basis for disturbing his sentence. We find nothing improper in the district court's analysis. Only recently this court has held that "a perceived need to equalize sentencing outcomes for similarly situated codefendants, without more, will not permit a departure from a properly calculated guideline sentencing range." *United States v. Wogan,* 938 F.2d 1446, 1448 (1st Cir.1991). The case against Butt is stronger yet, where, as here, the codefendants, because charged with and convicted of different offenses, are not "similarly situated" with respect to the sentencing guidelines.

The sentence of Herbert Alan Butt is *vacated and remanded* to the district court for proceedings in accordance with this opinion; in all other respects, the judgment of the district court is *affirmed.*

---

**19.** We have jurisdiction to review a trial court's refusal to depart downward from the guidelines only "where it is unclear whether ... [the] refusal to depart was based on an exercise of discretion or was based upon the ... court's finding that it could not depart as a matter of law." *United States v. Lauzon,* 938 F.2d 326, 330 (1st Cir.1991). In the instant case, it appears that the court was aware of its right, generally, to depart downward from the guidelines, but believed it lacked discretion to depart on the particular ground urged by Butt. This determination strikes us as reviewable.