Judge BAKER delivered the opinion of the Court.
A general court-martial composed of members convicted Appellant, contrary to his pleas, of carnal knowledge, two specifications of assault consummated by a battery, assault with a means likely to produce death or grievous bodily harm, communicating a threat, and kidnapping, in violation of Articles 120, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 928, 934 (2006). The adjudged and approved sentence included confinement for six years, reduction to pay grade E-l, forfeiture of all pay and allowances, and a dishonorable discharge.
On review, the United States Navy-Marine Corps Court of Criminal Appeals affirmed.[1]
We granted review of the following issues: WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY EXCLUDING RELEVANT EVIDENCE THAT SHOWED THE ALLEGED VICTIM HAD A MOTIVE TO FABRICATE HER STORY.
WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY EXCLUDING EVIDENCE EXPLAINING WHY APPELLANT TOLD WITNESSES THAT THE ALLEGED VICTIM HAD NOT TAKEN HER MEDICATION, LEAVING THE MEMBERS WITH THE UNREBUTTED IMPRESSION THAT APPELLANT LIED ABOUT HER NEED FOR MEDICATION TO PROTECT HIMSELF AGAINST ALLEGATIONS OF MISCONDUCT.
For the reasons stated below, we conclude that the military judge did not abuse his discretion.
BACKGROUND
Appellant did not testify at trial. Therefore, the evidence of events within quarters on Camp Pendleton derives entirely from the victim EM’s testimony. However, the facts that were in evidence or in the record for the purposes of assessing the military judge’s rulings also derive from physical evidence of the victim’s injuries, witness testimony involving events outside quarters on Camp Pendleton, as well as any permissible uses of Appellant’s initial statement to investigators. It also includes the portions of EM’s medical records, testimony of EM’s mother, and testimony of Dr. Herbert McMichael that were admitted during the Article 39(a), 10 U.S.C. § 839(a) (2006), session conducted for the purpose of assessing Appellant’s proffer of evidence.
EM was a minor who lived on the Cahuilla Indian Reservation in California. As a child, EM experienced a number of family traumas: her maternal grandfather shot and killed her mother’s boyfriend, and her younger sister and cousin were killed by a drunk driver (the drunk driver was also EM’s cousin). In the wake of these events and because her mother caught her using marijuana, EM entered psychological therapy around age twelve: she saw a psychologist associated with Indian *112 Health Services, Dr. McMichael, an average of seven times per year from 2002 to 2007.
EM identifies Appellant as her cousin. In June 2005, there was an incident that predated the charged offenses. EM was visiting Appellant at his house in Hemet, California, about forty-five minutes from the reservation. EM was fifteen. EM testified that Appellant “forced [her] to have sexual intercourse with him.” This was the basis for the carnal knowledge specification under Article 120, UCMJ.
The event resulting in the other charges occurred approximately two years later, in September 2007. September 22, 2007, was EM’s seventeenth birthday, and EM had a barbeque with family at her house. Appellant could not attend. However, Appellant called EM ten to fifteen times and texted her about fifty times until she answered. According to EM, Appellant asked her to go to a movie with him; when she declined his offer, he “said that if I didn’t go to the movies, he would show up at my house and he would kill me.” EM agreed to go to the movies.
EM met up with Appellant the next day at a motocross race. Appellant texted her that he was “parked behind a bike trailer.” He refused her mother’s request to say hello and drove off when EM got in the ear. They stopped for fast food. As Appellant ate in the car, EM informed Appellant that she had told her mom to meet them at the movie theater, and he seemed “a little bit upset” at this.
Appellant then told EM that he was feeding the dogs for his Officer-In-Charge at Camp Pendleton. Entering Camp Pendle-ton, military police pulled over Appellant and gave him a ticket. As Appellant pulled into the driveway, EM said she wanted to wait in the car while he fed the dogs, but he “was getting angry” and told her to go inside. A neighbor approached as they were entering the house and said that the dogs had been fed and “taken care of.” Appellant then told EM that the neighbor “took care of [the dogs] on weekends.” This prompted EM to ask “what we were doing here,” and “he wouldn’t answer.”
At this point, EM testified, “I was nervous and scared.” Appellant went in the living room, sat on the couch and began watching TV. EM stated she wanted to leave, and then yelled that she wanted to leave. Appellant “told [EM] that we weren’t going to leave until we did something.” EM testified, “I think [it] meant he wanted to perform some kind of sexual activity with me.” EM’s sister called and EM answered; Appellant got angry and told her to hang up. When she was off the phone, Appellant repeated that “we weren’t leaving till we did something.”
EM said she “tried walking out the front door” but “[Appellant] had grabbed the back of my sweatshirt and pulled me down to the couch .... He had throw[n] his shorts off and tried pushing my head .... [h]e put it around the back of my neck and pushed— pushed my head down.” According to EM, he had pulled his shorts “almost midthigh” and his boxers down. EM made a run toward the front door, but it was locked and she didn’t get it open in time. Appellant grabbed her “[l]ike in a headlock” and dragged her down the hallway. EM rated his use of force as an “eight or nine” on a scale of one to ten.
As he dragged her down the hallway, Appellant “had pulled the hood from my sweater over my face and held ... one of his hands down on my nose and my mouth and the other hand around my neck.” EM testified that she “thought he was trying to kill me. And I thought I was going to die.” She testified that she dialed 911 in her pocket but lost consciousness, and when she came to, Appellant took the phone from her hand and hung up before she could say anything. EM ran to the bedroom and reached for the window, but Appellant pulled her away; Appellant told her to be quiet or he was going to kill her.
Appellant walked out of the bedroom; EM was trying to stand, leaning over a dresser. He came back to the room with a knife in his hand. First, according to EM, he held the knife to EM’s neck and “told me that, if I wasn’t going to be quiet, that he was going to kill me.” Then he offered EM the handle *113 “[a]nd he told me that ... if I was going to tell someone what he had done then just to kill him.” Appellant seemed “scared” and “like he wanted to cry.”
EM testified that at this point she ran for the door. She got it unlocked, opened it, and Appellant grabbed her again in a headlock, locked the door, threw EM to the floor and when she stood up, punched her in the mouth. She stood up and walked toward the third bedroom, trying to push Appellant away. He hit her head on the corner of a tall dresser. Appellant subsequently told EM to get in the ear. She was afraid that “he’d do something like maybe get us in a car wreck or something and try to kill both of us. I still didn’t think he was going to let me live that day.” They walked through the house toward the driveway and he discussed what EM should tell her mom to explain her unanswered calls. When he opened the passenger door for EM, she ran down the street until she “saw a lady. And I asked her to help me. And I just kind of collapsed on the — on the grass area. I think it was someone’s yard.”
The lady EM saw was Eileen Taylor, a neighbor who was on a walk with her young children. When EM collapsed, Taylor, who had previously worked as a registered nurse, kneeled over her. Other neighbors saw them and came outside. Witnesses described EM as “hyperventilating,” “eyes rolled in her head,” and saying, “[h]e hurt me.”
Appellant watched EM from down the street and then drove over in his car. Appellant told Lieutenant Colonel (Lt. Col.) Kenneth Maney and his wife, neighbors who were among the bystanders, that “she missed a series of her meds” and attempted to persuade EM back into the ear. Lt. Col. Maney testified that EM “made it clear to me that [she thought] he would hurt her.” As the situation progressed, “her health was starting to deteriorate” and they “couldn’t get a pulse on her.” Lt. Col. Maney and the other bystanders called EM’s mother and then the Provost Marshal’s Office, which sent military police and an ambulance. Military police questioned Appellant at the scene as the ambulance took EM to the hospital.
The defense argued at trial that EM was mentally unstable and “fabricated the allegations against Cpl. Sullivan because she attempted to mutilate herself and had suicidal ideations on 23 September 2007.” According to Appellant, EM feared that her mother would send her to be hospitalized if her mother discovered the true source of her injuries as self-inflicted or having occurred during Appellant’s attempt to stop EM’s self-injury. Appellant further argued that EM’s condition was prone to triggering events, like birthdays, and cyclical in nature, making past behavior relevant to current conduct. To support this defense, Appellant sought to present evidence of EM’s prior self-mutilation and “suicidal ideations” allegedly discussed with Dr. McMiehaels during her prior treatment and recorded in her medical records.[2]
The military judge called an Article 39(a), UCMJ, session to determine the admissibility of Dr. McMichael’s proposed testimony, particularly regarding EM’s past medication *114 prescriptions and history of self-mutilation or “suicide ideation.” He concluded that it did not meet the relevancy requirement and that any relevance was outweighed by potential prejudice pursuant to Military Rules of Evidence (M.R.E.) 401 and 403. He also ruled inadmissible the defense’s cross-examination of EM and her mother on the subject of her past suicide ideation, self-mutilation, and medications. The military judge stated on the record that he excluded this evidence based on failure to establish a relevant connection to the case (from which members could draw permissible inferences).
Because these subjects were repeated and because the military judge invited the defense counsel to revisit the topic or recall witnesses if they could establish relevance, the record contains multiple discussions with counsel and rulings by the military judge.[3] Ultimately, the military judge detailed his decisions in written findings of fact and conclusions of law rooted in M.R.E. 401 and M.R.E. 403.
[T]he [Constitution does not confer upon the accused a right to present any and all evidence at trial, but only the evidence which is legally and logically relevant.
... [Ejvidenee that the defense sought to elicit here was not bias, because at no point was there a fragile theory of bias presented.... Under 403, in doing an analysis, a balancing analysis on this issue, I found that the evidence that the defense was trying to admit ... had very low probative value.
... Conversely, the danger that the members would misuse the evidence and use it for an improper purpose or ... distract from the main issue in the case was very high.
On appeal, Appellant argues that he was denied the opportunity to put on a defense because EM’s mental health records were relevant and central to his claim that EM’s injuries were self-inflicted and that she had a motive to fabricate. Appellant further argues that the military judge violated his constitutional right to confront witnesses because the military judge restricted the admission of evidence that went toward EM’s credibility based on her psychological history-
DISCUSSION
This Court reviews a military judge’s evidentiary decisions for an abuse of discretion. United States v. Ediger, 68 M.J. 243, 248 (C.A.A.F.2010).

*115
Issue I: Evidence of Motive to Fabricate

The Confrontation Clause preserves the right of an accused “to be confronted with the witnesses against him.” U.S. Const, amend. VI; United States v. Carruthers, 64 M.J. 340, 344 (C.A.A.F.2007). This right includes the right to cross-examine witnesses, including on issues of bias and credibility. In fact, “This Court has held that rules of evidence should be read to allow liberal admission of bias-type evidence.” United States v. Moss, 63 M.J. 233, 236 (C.A.A.F.2006).
At the same time, a military judge retains “wide latitude” to impose “reasonable limits” upon cross-examination. Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), quoted in Carruthers, 64 M.J. at 341. Moreover, evidence must satisfy the rules of evidence. An accused does not have a right to cross-examine a witness on any subject solely because he describes it as one of credibility, truthfulness, or bias. There must be a direct nexus to the case that is rooted in the record. That is, the evidence must be logically relevant as required by M.R.E. 401, and it must also be legally relevant in accordance with the M.R.E. 403 balancing test. In short, the right to cross-examine is the right to question where the proffer establishes a real and direct nexus to a fact or issue at hand. That nexus is as important where the concern involves inquiry into the victim’s medical background and privacy as it does when it involves traditional M.R.E. 403 concerns like distraction and confusion of the members.
In our view, the military judge did not abuse his discretion in ruling that Appellant did not establish such a nexus in this case. First, Appellant’s theory of admission was based in part on the prospect that EM feared hospitalization if her mother believed she had sought to injure herself. However, there is no evidence in the record that EM contemplated the possibility of hospitalization. There is also no evidence that EM’s mother would consider hospitalization in the ease of a future cutting incident. Significantly, defense counsel did not question EM or her mother on this subject at trial — nor did the military judge preclude defense counsel from doing so. (To his credit, Appellant’s counsel acknowledged as much at oral argument.) The mere fact of prior psychological counseling does not create a sufficient nexus to inquire into a victim’s medical history. A direct nexus is needed.
Further, EM’s injuries were not similar to those Dr. McMichaels described as associated with EM’s prior self-mutilation through cutting. At one point, the military judge asked defense counsel: “[I]s there anything on the record that shows that she did these injuries? ... I just want to be certain about that.” Defense counsel responded by acknowledging the question and stating, “[N]o, sir.” Subsequently, the military judge found “the injuries were marks to her neck and a cut lip, which in no way was ever presented as something that she had done to herself.” Again, there is no direct nexus that would open the door to inquiry regarding the victim’s mental health counseling for cutting.
As a result, this case is distinguished from Moss, 63 M.J. at 238-39, a case Appellant cites, in which this Court reversed the trial court’s decision to exclude testimony regarding the victim’s mental health records and history. To start, Moss was a “ ‘he said/she said’ scenario.” Id. at 237. The testimony of the accused and the victim stood alone and “[t]here was no other evidence to corroborate the sexual misconduct.” Id. In contrast, in this case there were witness bystanders who testified to the circumstances immediately following the incident as well as evidence of EM’s physical injuries, which tended to corroborate EM’s testimony.
In Moss, there was also a direct nexus between the proffered evidence and evidence on record at trial. Id. The victim had been repeatedly punished, beaten, and institutionalized “as a result of behavior problems and suicide attempts,” contemporaneous with the events in question. Id. at 235. The record also reflected that the victim had lied to her mother, school officials, and mental health professionals, for which there was evidence in her mental health records. Id. As a result, this Court recognized a “viable defense theory as to why KLVD would fabri *116 cate the rape allegations,” because “KLVD had a motive to misrepresent the event with Appellant in order to change her own present circumstances,” and alter the context of her relationship with her mother. Id. at 235, 237. The Court concluded, “[a] reasonable panel might have reached a significantly different impression of [the victim]’s credibility had the defense been able to present the excluded evidence.” Id. at 237. Thus “the military judge’s exclusion of the proffered evidence denied Appellant his fundamental right of confrontation and cross-examination.” Id. at 236. This case is not Moss; Appellant did not provide the factual predicate necessary to create a sufficient nexus between EM’s previous mental health issues and counseling and Appellant’s theory of admission to overcome the M.R.E. 403 balancing test.[4]
Further, and important to our reasoning, Appellant was given the opportunity to demonstrate such a nexus. First, all of the records of EM’s visits with Dr. McMichael were available to Appellant, and the defense was able to question Dr. McMichael out of the presence of the members to attempt to show the relevance of his proposed testimony.
Second, the military judge repeatedly conducted balancing tests, on the record, in light of M.R.E. 401 and M.R.E. 403. Appellant had the opportunity to make his case, the military judge stating on at least three occasions that if the defense was able to produce evidence that would demonstrate a connection, he would revisit the topic. In short, the military judge treated the relevance and balancing determinations with the care necessary to uphold the accused’s constitutional rights while also protecting the privacy of the victim and did not abuse his discretion in doing so.[5] Therefore, we are satisfied that the military judge considered the M.R.E. 403 factors and the probative value of this evidence, and did not abuse his discretion.

Issue II: Medication Evidence

The second issue is related to the first because it also tests the balance between an accused’s right to confront witnesses and put on a defense and a witness’s medical and personal privacy. It, too, presents a question of legal and logical relevance as to whether Appellant demonstrated a sufficient nexus between his proffered evidence regarding EM’s past use of medication and a fact or issue at trial.
The defense sought to introduce evidence of EM’s prescribed medications history prior to 2007, in particular during the years 2002, 2003, and 2005. The defense argued that it was necessary to show why Appellant told the bystanders that EM had “missed her medication” as an explanation for her behavior on the day of the incident. Appellant argues that because he was aware of EM’s prior medication, he might reasonably have thought she was still on medication at this later time. In the alternative, Appellant argues that trial counsel opened the door to this evidence by eliciting testimony that EM was not on medication at the time of the incident, and thus the military judge abused his discretion in excluding the evidence.
As with the first issue, the military judge excluded this evidence based on a lack of logical relevance. The military judge found that there was no evidence on the record that showed that EM was on medication at the time of the incident. Neither was there evidence before the court that Appellant believed EM to be on medication in September 2007.[6] To the contrary, the record contained *117 EM’s testimony that she was last on medication in 2003. Moreover, EM’s testimony is consistent with Dr. MeMiehael’s testimony during the Article 39(a), UCMJ, session that EM had not been on medication for a number of years — he testified that his last prescription for EM was in 2005.
Thus, in our view, the military judge correctly determined that Appellant’s statements at the scene that EM needed her medication, made inquiry about EM’s use of or lack of medication in 2007 relevant. But it did not make her history of medication in prior years relevant, absent some showing that such prior medication would affect her ability to perceive events or tell the truth at a later time.
Evidence of a witness’s psychological state is properly excluded if it did not affect her “ability to perceive and tell the truth.” United States v. Butt, 955 F.2d 77, 83 (1st Cir.1992). Conversely, it should be admitted if it relates to the witness’s ability to perceive events and testify accurately. United States v. Lindstrom, 698 F.2d 1154, 1165-66 (11th Cir.1983).[7] As with Issue I, the problem here is one of establishing a sufficient nexus to satisfy the requirements of M.R.E. 401 and especially M.R.E. 403.
In Butt, the witness had attempted suicide and been hospitalized; her hospital records revealed diagnoses of “splitting,” “hysteroid dysphoric,” and “borderline personality disorder.” 955 F.2d at 80. Nevertheless, the United States Court of Appeals for the First Circuit affirmed the trial court’s decision to exclude her mental health records as “not relevant to her veracity” because “a tighter logical nexus was necessary to justify the introduction of such personal and potentially stigmatizing material.” Id. at 83-84. Similarly, in the words of the military judge in the present case, “The girl is 17 years old and everyone’s been on medication.”
Appellant retained a number of avenues through which to attack EM’s credibility, which he did. For instance, defense counsel introduced testimony of MP, a former friend of EM, and her mother DJ, who testified to EM’s lack of truthfulness and implied that she had fabricated her testimony. Ultimately, however, Appellant failed to establish a sufficient nexus between his statement and inquiry into EM’s prior medical history and records or prescriptions to survive the balancing test provided in M.R.E. 403. The military judge did not abuse his discretion in restricting the admission of evidence of EM’s self-mutilation, suicide ideation, or past use of medication.
CONCLUSION
The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

. United States v. Sullivan, No. NMCCA 200900148, 2010 CCA LEXIS 19, at *18, 2010 WL 520821, at *6 (N.-M.Ct.Crim.App. Feb. 12, 2010).

. "Suicide ideation,” according to psychologist Dr. McMichael, who introduced the term to this case, "doesn’t involve intent. It does not involve a plan." Rather, suicidal ideation involves thoughts that are "not unusual for daily life for healthy people.” Dr. McMichael described a continuum ranging from mere suicidal ideations to someone at high risk of suicide, who is developing an intent and a plan, which is "much different from a suicidal ideation.” For example, Dr. McMichael offered, "if I had an automobile accident and I crush up my wife's car and said, Oh, my goodness. I wish I were dead.... She’s going to read me the riot act. That’s an ideation.”
The term self-mutilation, as used by Dr. McMi-chael in his proposed testimony, is distinct from suicide ideation. He testified, ”[s]elf-mutilation is a coping skill. It’s a dysfunctional coping skill, but it’s nonetheless an effective coping skill.” Discussing self-mutilation, Dr. McMi-chael noted:
It reduces the psychological pain that the person is having. And it’s a cut across the arm. Cutting is a cut across the arm. When they start cutting down the arm[s] that's no longer cutting, that’s a suicide attempt. So that’s not cutting, that's not self-mutilation. And cutting across the thighs is typical of someone who has had a lot of trauma in their life, as well as cutting across the arms.

. The military judge held:
Defense counsel characterizes this evidence as bias. When it appears that what this actually is, is character evidence to show action and conformity there with [sic]; that is, [EM] exhibits these traits, does these things, is this type of person, and she was this type of person on September 23, 2007.
He based this on prior examinations in which he stated:
I, again, am not going to allow you to get into her suicide ideations or self mutilation.... [F]irst off, ... I have not heard the relevance. I have asked both sides a couple times. I have not heard the relevance of it. So that is number one.
Number two, I see no way that the government has somehow opened the door on this issue by either direct or otherwise.
Whatever relevance there may be there, if there is any, I would say that under 403 that this type of evidence must be kept out in order to not confuse the members or to get in improper evidence on the alleged victim that is not relevant to these charged offenses.
He later gave the defense counsel another opportunity:
Connect for me the embarrassment of self mutilation and the threat of residential treatment to making up these allegations.
... [S]how me the linkage of how that would go to show her making false allegations against the accused.
... What evidence is on the record right now that she injured herself?
... [W]hat evidence is on the record that she injured herself? Is there something on the record?
When the defense counsel was unable to demonstrate a connection, the military judge stated:
[Y]ou can’t just pull out something that happened six months ago and say, Ha, we’re going to bring this in. There’s got to be some connection. There's got to be some relevancy to the charged offense. And right now there's nothing in the record that shows that.

.The military judge specifically concluded:
So I felt the probative value of this evidence was extremely low. Conversely, the danger that the members would misuse the evidence ... was very high.
... [A] link that was missing in the defense theory here was that evidence that somebody who suffers from adjustment disorder with mixed emotions and post traumatic stress disorder would react in the way that the defense presented.

. See United States v. Collier, 67 M.J. 347, 353 (C.A.A.F.2009) (to constitute an abuse of discretion, a military judge’s ruling "must be more than a mere difference of opinion; rather, it must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous” (quotation marks omitted)).

. The lower court noted this as well. 2010 CCA LEXIS 19, at *8, 2010 WL 520821, at *3.

. In Lindstrom, "medical records showed that a government witness had manipulated the results of a medical test and woven an 'intricate fabrication’ to explain it, that the witness 'chronically misinterpreted the words and actions of others,' and that she exhibited 'pseudoneurotic schizophrenia with marked paranoid trends.’ " Butt, 955 F.2d at 83 (quoting Lindstrom, 698 F.2d at 1164-65).