UNITED STATES of America

v.

Francis S. KEY, Aviation Structural
Mechanic Second Class (E–5),
U.S. Navy.

NMCCA 201100417.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 28 April 2011.

10 July 2012.

For Appellant: LT Daniel C. LaPenta, JAGC, USN.

For Appellee: LT Joseph M. Moyer, JAGC, USN.

Before C.L. REISMEIER, B.L. PAYTON–O'BRIEN, J.A. MAKSYM, Appellate Military Judges.

## PUBLISHED OPINION OF THE COURT[1]

REISMEIER, Chief Judge:[2]

A general court-martial composed of a military judge convicted the appellant, contrary to his pleas, of violating a lawful general order, aggravated sexual assault, indecent conduct, adultery, and obstruction of justice, in violation of Articles 92, 120, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 920, and 934. The appellant was sentenced to seven years confinement, reduction to paygrade E–1, and a dishonorable discharge. The convening authority (CA) approved the sentence as adjudged.

The appellant asserts five assignments of error. First, he asserts that the evidence was legally and factually insufficient. Second, he claims that the military judge erred by barring evidence regarding the victim's language to a co-actor moments before the sexual assault, and evidence of a prior affair between the victim and another party. The appellant's third and fourth assertions are that the specifications under Charge V are fatally defective, as they fail to allege the "terminal element" of Article 134. Finally, the appellant maintains that his seven-year sentence was inappropriately severe when the co-actor was sentenced at a special court-martial to "restriction-like punishment."[3] This court ordered oral argument as to part

of the second issue, addressing whether the military judge erred by barring evidence of the words the victim spoke prior the assault, and whether the alleged error could be deemed harmless.

We have considered the record of trial, as well as the briefs and oral arguments for both sides. We will set aside the findings of guilty of the specifications under Charge V in light of *United States v. Humphries*, 71 M.J. 209 (C.A.A.F.2012). We conclude that no other error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 860(c).

## I. Background

The appellant was an instructor and "class mentor" at Aviation Structural Mechanic School in Pensacola, FL. The victim was one of the students. On Friday, 13 August 2010, the appellant provided his phone number to students, asking them to text him with their names. During class, students also were asked to disclose their plans for the weekend.

That evening the victim arrived at Flounders, a restaurant and bar on Pensacola Beach, around 2030. She was accompanied by three other junior enlisted. After she had already consumed a few drinks, the appellant arrived at the bar, joining the victim and Airman (AN) Q, another student. The appellant and AN Q exchanged various text messages through the evening, including texts before the appellant joined the group. The appellant, AN Q, and the victim continued drinking. While the amount of alcohol she consumed was in dispute, the victim drank enough to become highly intoxicated. The victim, AN Q, and the appellant left the bar, and walked to the end of a pier behind the establishment.

At this point, the victim was unstable, being guided by AN Q and struggling to maintain her balance. At the end of the pier, she jumped into the water, which was too deep to

1. This opinion was originally released as an unpublished opinion and is rereleased as a published opinion at the request of the Director, Appellate Defense Division. *See* RULE 18.1(b), N.M.CT. CRIM.APP. RULES OF PRACTICE AND PROCEDURE (1 Aug. 2011)

2. Chief Judge Reismeier participated in the decision of this case prior to detaching from the court.

3. Raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982).

stand in. AN Q then entered the water, grabbed the victim, and swam to shallower water. Once in the shallows, the victim solicited AN Q to have sex with her. Accepting her offer, AN Q and the victim, who AN Q described as awake and moaning, commenced sexual intercourse. However, during the act of sexual intercourse, the victim seemed to be fading. AN Q described her body as going limp, as she no longer provided any resistance against his body. Likewise, AN Q began having difficulty performing. At the same time, AN Q heard the appellant call from the pier to "share." The appellant entered the water and positioned himself between the victim and the post against which the victim had been leaning, so that the victim was facing him as AN Q continued to have intercourse with the victim. When AN Q disengaged and turned to pull up his pants, the appellant began having sexual intercourse with the victim. AN Q stated that he could still hear the victim moaning.

AN Q asked the appellant if he was "in" her. The appellant responded affirmatively and, when told by AN Q that they needed to get out of the water, told AN Q to "just hold on for a second." The victim said nothing during any of this encounter. By this time, the victim was largely unresponsive. Her head was down, her eyes, though open, were partially closed. Her appearance was sufficiently changed that AN Q became concerned about her. The victim was unresponsive when brought to the shore. She was carried to the front of Flounders, where an off-duty deputy sheriff called for an ambulance. The deputy attempted to wake the victim with various stimuli, including a sternum rub (rubbing knuckles along the sternum to create a painful stimulus), but to no avail. The appellant repeatedly attempted to intervene, stating that he was an instructor and wanted to just take the victim to a hotel to sleep it off. Because he feared alcohol poisoning, the deputy declined to entrust the victim to her instructor. The victim remembered nothing from the time she began walking down the pier until awakening in the hospital.

At the hospital, the appellant spoke to an obviously distraught AN Q, telling AN Q not to worry, adding that "there wasn't gonna be a rape kit run on her." He also told AN Q to delete his text messages, and suggested telling people that the victim just fell into the water and that they went in to get her out.

The victim arrived at Gulf Breeze hospital around 0230, and presented with a blood alcohol concentration (BAC) of .285. A vaginal examination resulted in a finding of a semen-like substance inside the victim's vagina. The victim remained unresponsive at the hospital, reacting only to painful stimuli. At 0600 she was still unconscious.

At trial, conflicting evidence was offered regarding the victim's BAC at the time of the assault. Retrograde extrapolation was used by the Government's expert to determine that, moving back from the BAC level established at the hospital, the victim's BAC at the time of the assault would have been between .24 and .28. The defense expert offered that such analysis could not be used in this case because it required too many assumptions on the part of the Government expert. The main difference between the prosecution and defense experts was whether the victim was truly "post-absorbtive" at the time of the assault, meaning at a point where all of the alcohol in her digestive system was absorbed into her blood stream. The defense theory was that the victim's rapidly declining level of sobriety suggested that she was still in control of her faculties at the time of the assault, achieving a state of incapacity only after the assault. Alternatively, the defense theorized that the appellant, at a minimum, was under the mistaken belief that the victim was still capable of, and did in fact, consent.

## II. Factual Sufficiency

The test for legal sufficiency is whether, considering the evidence in the light most favorable to the Government, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987); *United States v. Reed*, 51 M.J. 559, 561–62 (N.M.Ct.Crim.App. 1999), *aff'd*, 54 M.J. 37 (C.A.A.F.2000); *see also* Art. 66(c), UCMJ. The test for factual sufficiency is whether, after weighing all the

evidence in the record of trial and recognizing that we did not see or hear the witnesses, this court is convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325; *see also* Art. 66(c), UCMJ.

We conclude that the evidence was both legally and factually sufficient. The victim was so irretrievably incoherent when taken from the water after the assault that she had to be carried to the front of the property, where she was unresponsive to even painful stimuli. Her blood alcohol serum level was .285 shortly later at the hospital. Even accounting for the defense theory that the victim was still absorbing alcohol when she entered the water, prior to entering the water, she was already unsteady, with slurred speech and in need of assistance to walk. Her lack of memory, the exchanges that occurred in the water, and witness accounts of unresponsiveness immediately after the assault conclusively establish her status during the assault. Likewise, whatever capacity remained shortly before the appellant's assault, and whatever capacity she might have displayed during her conversation with and comments to AN Q was lost by the time of the appellant's assault. The appellant's own words belie any suggestion that the victim either still retained capacity, or that he somehow believed she did so: "Don't worry, there [isn't] gonna be a rape kit." His words suggest convincingly that he believed the victim was incapacitated, not just when he himself assaulted her, but at some point preceding or during the intercourse between AN Q and the victim. The appellant's attempts to prevent hospitalization and his encouragement of AN Q to destroy the text messages take on an entirely different and entirely less altruistic meaning in light of the entire course of events.

### III. The Exclusion of Evidence

 The appellant claims that the military judge improperly excluded the content of the victim's speech while she was engaged in intercourse with another servicemember moments before the assault, where such conduct was within perception of the appellant. He also claims that the military judge improperly excluded evidence of the victim's prior affair under MILITARY RULE OF EVIDENCE 412, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2008 ed.).

### *The Exclusion of the Content of the Victim's Speech*

We review a military judge's determination to exclude evidence pursuant for an abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F.2010). We consider his findings of fact under a clearly erroneous standard, and his conclusion of law *de novo*. *United States v. Reister*, 44 M.J. 409, 413 (C.A.A.F.1996). The Confrontation Clause preserves the right of an accused "to be confronted with the witnesses against him." U.S. CONST. amend. VI; *United States v. Carruthers*, 64 M.J. 340, 344 (C.A.A.F.2007). Cross-examination is not without limits, and the proffered evidence must be tested under MIL. R. EVID. 401 and 403. *United States v. Sullivan*, 70 M.J. 110, 115 (C.A.A.F.2011). "In short, the right to cross-examine is the right to question where the proffer establishes a real and direct nexus to a fact or issue at hand." *Id.*

We conclude that the military judge erred in excluding evidence regarding the specific words spoken by the victim to AN Q shortly before the assault. In the instant case, the military judge incorrectly determined that the proffered evidence fell under the purview of MIL. R. EVID. 412. MIL. R. EVID. 412(a) states that "[e]vidence offered to prove that any alleged victim engaged in other sexual behavior" is generally inadmissible, with some exceptions. Sexual behavior "includes any sexual behavior, *not encompassed by the alleged offense.*" MIL. R. EVID. 412(d) (emphasis added). The content of the victim's speech was encompassed by several of the alleged offenses. The appellant was charged with watching AN Q engage in sex with the victim, engaging in sex with the victim in front of AN Q, making a false official statement based on the appellant's knowledge that AN Q and the victim in fact "were having sexual relations under the pier," and with engaging in a sexual act with the victim while she was substantially incapacitated, an act which in this particular instance overlapped the act which produced the disputed vocal content.

Despite the nexus between the charged offenses and the language spoken, the military judge reviewed this evidence as "other sexual acts" and erroneously applied the test articulated in MIL. R. EVID. 412.[4] In applying the tests of logical and legal relevance under MIL. R. EVID. 401 and 403, we find that the content of the victim's speech should have been admitted. The appellant was charged with knowingly observing AN Q and the victim have sexual relations under the pier. The particular words spoken, relating to the charged activity and spoken contemporaneously with the activity, are clearly material to what he knew or did not know. The words also bear directly on capacity, as they indicate an awareness of the victim's surroundings, her appreciation of what was happening, and in the instance of the first words at issue, a desire to engage in the acts with AN Q. The words could show that the victim either retained capacity to consent, or at least could have acted in a way that may have supported a claim of mistake of fact as to consent by the appellant. Under the analysis, they should have been admitted because the words were close in time to the assault and rooted in the events happening at that time.

■ Having concluded that the judge erred, we test for prejudice. We conclude that this error was harmless beyond a reasonable doubt. We begin by noting that while the military judge excluded the actual words spoken, he permitted the defense to introduce the fact that the victim and AN Q were speaking during the relevant time frame. The military judge, as the finder of fact, was fully aware that the victim was speaking to AN Q, a fact which reduces the amount of prejudice the appellant's case may have suffered with regard to the charge of aggravated sexual assault. Further, the possible use of this fact by the Government with regard to the other charges—showing knowledge on the part of the appellant as to what he was observing in the water—seems to cut against the appellant's favor. We also note that the military judge's ruling barred only

the actual words spoken. The Government itself elicited the fact that the victim was speaking, and that she herself invited sexual intercourse with AN Q.

Additionally, whatever value the actual words exchanged may have had, that value was overwhelmed by the state of the evidence regarding the victim's faculties. She needed assistance walking down the pier. She was drunk enough that AN Q took away her drink. She was unresponsive except for moaning while in the water once the appellant joined her and, according to AN Q, reached that state before the appellant began his assault. Her appearance caused AN Q concern; she at no point spoke when AN Q ceased his activity and the appellant began his. In point of fact, AN Q had to ask the appellant whether the appellant was "in" her, despite the fact that the victim at that point was right in front of him with the appellant behind her. The question and answer provide a telling exchange regarding the victim's state at that time, suggesting that the victim herself could not convey the information, and conveying the clear understanding that whatever sounds the victim may have been making did not cause AN Q, standing in front of the victim, to conclude that consensual intercourse was taking place. When the assault finished, she again said nothing, even when AN Q had to pull her pants back up. Moments later, she was essentially carried from the water, and arrived at the hospital with a BAC of .285.

As stated above, the appellant's own words at the hospital, spoken to AN Q, relate that he well-knew that the victim's state at the time in question precluded consent, or any persuasive argument that the appellant mistakenly thought she consented. One who thinks he had consent does not console himself or another with the belief that no one will check to see if the victim had sex. Based on the evidence of record, we conclude beyond any reasonable doubt that the error resulted in no prejudice to the appellant.

4. We note that even under an analysis under MIL R. EVID. 412, this evidence should have been admitted into evidence.

### The Exclusion of the Prior Affair Under Mil. R. Evid. 412

 Regarding evidence of the victim's affair with another Sailor, we are not persuaded by the appellant's arguments as to error. This issue was properly analyzed by the military judge under Mil. R. Evid. 412.

Mil. R. Evid. 412 is a rule of exclusion, intended to shield victims. It includes three exceptions, however: when specific instances of sexual behavior by the victim are offered to prove that someone other than the accused was the source of some evidence, when the behavior is offered to prove consent, or when exclusion would violate the appellant's constitutional rights. *United States v. Banker,* 60 M.J. 216, 221 (C.A.A.F.2004). As the Court of Appeals for the Armed Forces stated in *United States v. Ellerbrock,* 70 M.J. 314, 318 (C.A.A.F.2011), "evidence must be admitted within the ambit of M.R.E. 412(b)(1)(c) when the evidence is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice." The dangers of unfair prejudice include concerns about "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Ellerbrock,* 70 M.J. at 319 (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). The review includes consideration of the appellant's constitutional rights of confrontation, including the right to impeach and discredit the witness. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). If the evidence survives the inquiry, the final consideration is whether the evidence in the record supports the inference that the moving party is relying on. *Ellerbrock,* 70 M.J. at 319

The victim denied any fear that disclosure of her sexual liaisons with either AN Q or the prior Sailor would damage her already faltering marriage, or that her adulterous actions might negatively impact her career. Whatever marginal logical relevance the evidence might have had under the defense theory was not supported by the evidence adduced in the record. In some cases a prior affair can be a powerful motive to fabricate, however, the inference which the appellant asks this court to draw is not supported by the record. Unlike in *Ellerbrock,* nothing suggested that the victim did not want the marriage to end, that she feared her husband or for her career, or that she desired to protect her marriage. While the appellant is correct in that the specific timing of the affair is not dispositive of evidence to fabricate, the fact remains that something other than the affair itself must be present to create motive. The victim openly admitted to the prior affair, calling it "casual sex." She denied recall of the intercourse with AN Q, but readily admitted that she could have consented to it. While it may be a fair inference in some cases that a consensual event outside a marriage could be damaging, and that a second might be more damaging than one, the record here does not support that for this victim that inference held true.

However, even assuming, *arguendo,* that the military judge erred, we find no prejudice to the appellant, again, for the reasons already noted. The victim's condition, the exchanges between the appellant and AN Q, and the appellant's own statements overwhelmingly counter any suggestion that the victim lied by claiming a lack of recall in order to prevent the repercussions for infidelity. Even if she had a motive to fabricate, the facts of record do not support a conclusion that the appellant suffered any prejudice.

### IV. The Missing Terminal Element

 The appellant correctly notes that both specifications under Charge V failed to contain an explicit allegation of service discredit or prejudicial conduct, as required for violations of Article 134, UCMJ.

Whether a specification states an offense is a matter we review *de novo. United States v. Crafter,* 64 M.J. 209, 211 (C.A.A.F.2006). A specification states an offense if it alleges every element of the offense, either expressly or by necessary implication. *United States v. Ballan,* 71 M.J. 28, 33 (C.A.A.F.2012); *United States v. Fosler,* 70 M.J. 225, 229 (C.A.A.F.2011); *Crafter,* 64 M.J. at 211; Rule for Courts-Martial 307(c)(3), Manual for Courts-Martial, United States (2008 ed.). When a specification does not expressly allege an element of the intended offense,

appellate courts must determine whether the terminal element was necessarily implied. *Fosler,* 70 M.J. at 230. The interpretation of a specification in such a manner as to find an element was alleged by necessary implication is disfavored. *Ballan,* 71 M.J. at 33–34. "[I]n the plain error context the defective specification alone is insufficient to constitute substantial prejudice to [an appellant's] material right[.]" *Humphries,* 71 M.J. at 215 (citations omitted). Where the prejudice to a material right is rooted in notice, the record is examined to see if the missing terminal element is somewhere extant in the trial record, or whether the element is essentially uncontroverted. *Id.*

Looking to the plain language contained within the four corners of the specifications, we are unable to conclude that they allege the terminal element expressly or by necessary implication. *See United States v. Nealy,* 71 M.J. 73 (C.A.A.F.2012). However, consistent with *Nealy,* having found error, we will test for prejudice.

The appellant has the burden of demonstrating prejudice. *Ballan,* 71 M.J. at 34 (citing *United States v. Girouard,* 70 M.J. 5, 11–12 (C.A.A.F.2011)). The appellant claims that he was not afforded notice of the charges against him, as is his right under the Fifth and Sixth Amendments. The record supports his claim. The pretrial proceedings did not make any mention of the terminal element. During the opening statement, the Government did not mention the element nor did they mention that they were going to introduce any direct evidence that might satisfy the element. No direct evidence was put on by the Government as to the service discrediting nature of the conduct or the prejudice to the good order and discipline of the armed services. No mention of the missing element was made in the closing arguments and since this was a military judge alone trial, there were no instructions given. The record simply lacks any indicia of notice. Therefore, in line with the court's reasoning in *Humphries,* we must conclude that appellant suffered prejudice.

For these reasons, the Article 134 specifications were defective because they failed to articulate all of the elements of the offense, either explicitly or by necessary implication. The error was plain and obvious, the Government did nothing to cure the error during the course of the trial, and prejudice to the appellant was apparent. Accordingly, the findings of guilty of Charge V and the specifications thereunder must be set aside and Charge V and both specifications dismissed.

## V. Sentence Reassessment

Applying the analysis set forth in *United States v. Sales,* 22 M.J. 305 (C.M.A.1986), *United States v. Moffeit,* 63 M.J. 40 (C.A.A.F.2006), *United States v. Buber,* 62 M.J. 476 (C.A.A.F.2006) and carefully considering the entire record, we conclude that there has not been a dramatic change in the penalty landscape and that we are satisfied beyond a reasonable doubt that even if the two specifications were dismissed at trial, the military judge would have adjudged a sentence no less than that approved by the convening authority in this case.

## VI. Sentence Severity

The appellant, via *Grostefon,* argues that his sentence is inappropriately severe when compared to that of AN Q. Because he raises issues of both severity and disparity, we will address both.

The appropriateness of a sentence generally should be determined without reference or comparison to sentences in other cases. *United States v. Ballard,* 20 M.J. 282, 283 (C.M.A.1985). We are not required to engage in comparison of specific cases "'except in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.'" *United States v. Lacy,* 50 M.J. 286, 288 (C.A.A.F.1999) (quoting *Ballard,* 20 M.J. at 283). The burden is upon the appellant to make that showing. *Id.* If the appellant satisfies his burden, the Government must then establish a rational basis for the disparity. *Id.* "Closely related" cases are those that "involve offenses that are similar in both nature and seriousness or which arise from a common scheme or design." *United States v. Kelly,* 40 M.J. 558, 570 (N.M.C.M.R.1994); *see also Lacy,* 50 M.J. at 288 (examples of closely related cases include co-actors in a

common crime, servicemembers involved in a common or parallel scheme, or "some other direct nexus between the servicemembers whose sentences are sought to be compared").

█ The appellant has not demonstrated that his case is closely related to that of AN Q. As noted in the staff judge advocate's recommendation, AN Q was tried by special court-martial and, pursuant to his pleas, was found guilty of violating a lawful general order (unduly familiar personal relationship with an instructor), adultery, and disorderly conduct. He was sentenced to forfeit $1,000.00 pay per month for three months, 60 days restriction, and hard labor without confinement for 60 days. He then cooperated with the prosecution of this case. While there is obviously some direct nexus between the cases, they were not involved in a common scheme to rape the victim. We do not find the sentence disparate under these circumstances.

Regarding sentence appropriateness, a court-martial is free to impose any lawful sentence that it considers fair and just. *United States v. Turner,* 34 C.M.R. 215, 217, 1964 WL 4998 (C.M.A.1964). Article 66(c), UCMJ, requires this court to independently determine the sentence appropriateness of each case we affirm. *United States v. Baier,* 60 M.J. 382, 384–85 (C.A.A.F.2005). "Sentence appropriateness involves the judicial function of assuring that justice is done and

that the accused gets the punishment he deserves," whereas clemency, a "command prerogative," "involves bestowing mercy—treating an accused with less rigor that he deserves." *United States v. Healy,* 26 M.J. 394, 395 (C.M.A.1988). In making the assessment of sentence appropriateness, we consider the nature and seriousness of the offenses as well as the character of the offender. *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A.1982). Given the nature of the assault and the abuse of position underlying the offenses, the sentence was wholly appropriate for these offenses and this offender. Sentence relief would amount to clemency. *Healy,* 26 M.J. at 396.

### VII. Conclusion

For the reasons stated above, the finding of guilty to Charge V and the specifications thereunder are set aside, and the Charge V and its specifications are dismissed. The remaining findings and the sentence are affirmed.

Senior Judge PAYTON–O'BRIEN and Senior Judge MAKSYM concur.