# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Captain JASON M. ALSTON**
**United States Army, Appellant**

ARMY 20140566

Headquarters, Fort Stewart
John T. Rothwell, Military Judge
Lieutenant Colonel Peter R. Hayden, Acting Staff Judge Advocate

For Appellant: Captain Jennifer K. Beerman, JA; Mr. William E. Cassara, Esquire (on brief); Lieutenant Colonel Charles D. Lozano, JA; Captain Heather L. Tregle, JA; Captain Michael A. Gold, JA (on reply brief).

For Appellee: Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Lieutenant Colonel Daniel D. Derner, JA; Captain Christopher A. Clausen, JA (on brief); Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie, III, JA; Captain Melissa Dasgupta Smith, JA; Captain Christopher A. Clausen, JA (on brief in response to specified issue).

31 October 2016

---------------------------------------
OPINION OF THE COURT
---------------------------------------

WOLFE, Judge:

We address three issues in this appeal. First, we address appellant's assigned error that the military judge erroneously excluded evidence offered pursuant to Military Rule of Evidence [hereinafter Mil. R. Evid.] 412. The military judge excluded evidence that the victim was in a romantic relationship at the time of the assault. We hold the existence of a romantic relationship is not "sexual behavior" or "predisposition" under Mil. R. Evid. 412. Nonetheless, we assess the exclusion of that evidence in this case to have been harmless error. Second, we address appellant's allegation that the military judge erred in not granting credit pursuant Article 13, Uniform Code of Military Justice [hereinafter UCMJ] 10 U.S.C. § 813

(2012).[1]  We find the military judge did not abuse his discretion.  Lastly, we address an issue specified by this court.  We find one of appellant's convictions for conduct unbecoming an officer and a gentleman to be multiplicious with his convictions for assault consummated by battery.

At a general court-martial appellant entered mixed pleas.  In accordance with his pleas, the military judge found him guilty of two specifications of assault consummated by battery and three specifications of conduct unbecoming an officer and a gentleman in violation of Articles 128 and 133, UCMJ, 10 U.S.C. §§ 928, 933 (2006).  Contrary to his pleas, a panel convicted appellant of one specification of aggravated sexual contact in violation of Article 120, UCMJ, 10 U.S.C. § 920 (2006 & Supp V 2012).  The panel sentenced appellant to a dismissal, confinement for five years, and forfeiture of all pay and allowances.  The convening authority did not approve the adjudged forfeitures, but did approve the remainder of the sentence.  Additionally, the convening authority deferred forfeitures until action, waived automatic forfeitures for six months, and credited appellant with thirty days confinement credit.

## BACKGROUND

### A. *What Happened in Las Vegas*

Captain (CPT) Jason Alston's guilty pleas all stem from misconduct occurring on 3 March 2012 at the Circus Circus Hotel and Casino in Las Vegas, Nevada.  Evidence regarding the offenses was provided by appellant's *Care* inquiry and by witness testimony during the presentencing proceeding.  *United States v. Care*, 18 C.M.A. 535, 40 C.M.R. 247 (1969).

Casino security personnel found Captain Alston sleeping in a deli that was adjacent to the casino floor.  By his own admission, he was "quite drunk."  Due to appellant's intoxication, initial attempts to wake him were unsuccessful.  Upon finally being awoken, CPT Alston responded with vulgarities and berated the

---

[1] Appellant also assigned as error that his conviction for aggravated sexual contact was legally and factually insufficient.  After reviewing the record and making allowances for not having seen or heard the witnesses, we disagree. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) ("For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of Military Review are themselves convinced of the accused's guilt beyond a reasonable doubt."); *see also United States v. Jimenez-Victoria*, 75 M.J. 768 (Army Ct. Crim. App. 2016).

security guard for being fat. For this conduct, he pleaded guilty to one specification of conduct unbecoming an officer and a gentleman.

Captain Jason Alston then walked into the women's restroom, entered a stall, and sat down on the toilet. Refusing to obey verbal commands to leave the women's restroom, appellant tried to shut the stall door on the two security officers. When one of the officers reached into the stall to escort appellant out of the women's restroom, CPT Alston responded by biting one of the security officers on the bicep and scratching and punching the face of a second officer. The bite was deep enough to leave a permanent scar. For the assaults against each casino security officer, appellant pleaded guilty to two specifications of assault consummated by battery. Additionally, appellant pleaded guilty to a single specification of conduct unbecoming an officer and a gentleman for assaulting the two security officers. The casino security staff turned CPT Alston over to the Las Vegas police. After informing the police that he was in the Army, CPT Alston then provided the police with false information in order to try to stay out of trouble. For his commanding officer's phone number, CPT Alston gave the police his wife's phone number. He also deliberately provided them with an erroneous social security number. For these actions, CPT Alston entered a third guilty plea for conduct unbecoming an officer and a gentleman.

Appellant assigns no error in the military judge's acceptance of his guilty pleas to these offenses.

*B. What Happened at Fort Stewart?*

The single contested specification stemmed from an encounter in the kitchen and laundry room of First Lieutenant (1LT) DA. Appellant and 1LT DA met when they both arrived at Fort Stewart, Georgia, in December 2011. As they were the only officers in-processing, they talked and went to lunch together on several occasions. Several weeks later, when 1LT DA's children arrived at Fort Stewart, she asked if CPT Alston would agree to be her emergency contact. Appellant also agreed to pace her as she prepared for an upcoming physical fitness test and invited her over to his place to watch a football game.

On 30 January, 2012, appellant stopped by 1LT DA's on-post house. After a while, and after her kids had gone to bed, appellant turned the conversation to the two of them starting a relationship. First Lieutenant DA firmly rejected his advances. She testified that she got up and went into the kitchen. Appellant unexpectedly followed her, grabbed her by the arms, and pushed her into the laundry room. She then testified that appellant forcibly grabbed her breasts and fondled her genitals through her clothing. She testified that the assault ended when she began crying and told appellant that she thought she could hear her kids waking up. Appellant left shortly after the 1LT DA's daughter came downstairs.

3

**DISCUSSION**

*A. Exclusion of Evidence Under Military Rule of Evidence 412*

Prior to the beginning of trial on the merits, appellant moved the court under Mil. R. Evid. 412 to allow the admission of certain facts. While the initial motion addressed a range of sexual activity the defense sought to admit, the defense abandoned most requests during the course of the trial, and left only one issue on appeal. In their motion, the defense sought to introduce the fact that at the time of the alleged assault, 1LT DA was in an "*intimate* relationship" with BP.[2] The military judge excluded all references to a "relationship," intimate or not. Appellant assigns the exclusion of this evidence as error. We view the issue as raising two separate questions: First, whether the military judge properly excluded the relationship between 1LT DA and BP as sexual (i.e. intimate). Second, whether the military judge properly excluded the existence of *any* relationship—without reference to its sexual nature. Answering the first question, we apply our superior court's decision in *United States v. Ellerbrock* and find no error. 70 M.J. 314 (C.A.A.F. 2011). We answer the second question in favor of appellant, and find, at least on the facts presented here, the existence of a relationship—stripped of any reference to sexual conduct—is not evidence prohibited by Mil. R. Evid. 412.

We find the relevant facts regarding the relationship to be as follows:[3]

a. Fall 2011: 1LT DA and BP began an exclusive "boyfriend-girlfriend" relationship.

---

[2] BP was a noncommissioned officer (E-6) at the time of the offense and an E-7 at the time of trial. However, at no time did the defense assert that the inappropriate relationship between an officer and enlisted person was relevant to the Mil. R. Evid. 412 issue or was otherwise relevant or admissible. If anything, the existence of a proscribed relationship worked against the defense's theory as it reduced the likelihood that 1LT DA would falsely claim a sexual assault since the resulting investigation would risk discovery of the prohibited relationship. While it is certainly possible the prohibited nature of the relationship informed the parties' tactical positions at trial, this nature went unstated. Accordingly, we will refer to Staff Sergeant BP simply by his initials.

[3] We adopt the military judge's findings of fact and include additional facts developed at trial. *See generally* Article 66(c), UCMJ, ("In considering the record, [a court of criminal appeals] may . . . determine controverted questions of fact. . . .").

b. December 2011: The relationship between 1LT DA and BP became long distance when 1LT DA reported to Fort Stewart, Georgia. BP was aware that 1LT DA and appellant had hung out and were "acquaintances."

c. 30 January 2012: The relationship between 1LT DA and BP continued without problems through the date of the alleged assault.

d. 31 January 2012: The day after the alleged assault, 1LT DA sent BP an email telling him that something "brutal and unspeakable happened last night." She provided him details of the assault when she saw him the following weekend.

e. 1 February 2012: The day after telling BP about the assault, 1LT DA filed a restricted sexual assault report.[4]

f. May/June 2012: The relationship between 1LT DA and BP ended after BP moved from the relative proximity of Florida to Hawaii.

g. July 2012: 1LT DA "unrestricted" her report of the assault. BP "supported" 1LT DA but did not "encourage" her to unrestrict the report.

h. Sometime in 2013, 1LT DA and BP were engaged and were married on 7 March 2014.

i. Trial took place in April – July 2014.

*1. Motive to Fabricate and United States v. Ellerbrock*

At trial, appellant moved under Mil. R. Evid. 412 for the ability to put the "intimate relationship" between 1LT DA and BP in front of the factfinder as "constitutionally required" under Mil. R. Evid. 412(b)(1)(C). For the purposes of our analysis here, we assume that the defense's request to introduce an "intimate relationship" incorporated a desire to tell the factfinder that the relationship was sexually active.[5] In other words, the defense motion requested to introduce evidence of 1LT DA's sexual behavior or predisposition.

---

[4] *See generally* Dep't of Def. Instr. 6495.02, Sexual Assault Prevention and Response (SAPR) Program Procedures [hereinafter DODI 6495.02] (7 Jul. 2015).

[5] We note that appellant's motion could be read to forgo any mention of a sexual aspect to the relationship between 1LT DA and BP. It stated: "[i]t is not the goal of the Defense to pry into the details of the sexual nature of 1LT [DA]'s relationship

(continued . . .)

5

At trial, appellant stated this evidence was necessary because it "gives 1LT [DA] motivation to fabricate an assault to hide the *appearance* of a relationship with the accused." (Emphasis added.). As is explained in more detail below, the defense theory of the case at trial was not that the sexual conduct between appellant and 1LT DA was consensual—but that the contact never happened.

We review the military judge's ruling on whether to exclude evidence pursuant to Mil. R. Evid. 412 for an abuse of discretion. *United States v. Roberts*, 69 M.J. 23, 26 (C.A.A.F. 2010).

Military Rule of Evidence 412 states that evidence offered by the accused to prove the alleged victim's sexual predispositions, or that she engaged in other sexual behavior, is inadmissible except in limited contexts. Mil. R. Evid. 412(a)-(b). The rule "is intended to 'shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to [sexual offense prosecutions].'" *United States v. Gaddis*, 70 M.J. 248, 252 (C.A.A.F. 2011) (citing *Manual for Courts-Martial, United States* (2008 ed.) [hereinafter *MCM*], Analysis of the Military Rules of Evidence app. 22 at A22-35).

As in *Ellerbrock*, "[w]hile there are three exceptions set out in the rule, we are concerned only with the third, which states that the evidence is admissible if "the exclusion of . . . [it] would violate the constitutional rights of the accused." *Ellerbrock*, 70 M.J. at 318 (citing Mil. R. Evid. 412(b)(1)(C)). The Court of Appeals for the Armed Forces (CAAF) neatly summarized the relevant authority as follows:

> The exception for constitutionally required evidence in [Mil. R. Evid.] 412(b)(1)(C) includes the accused's Sixth Amendment right to confrontation. An accused has a constitutional right to be confronted by the witnesses against him. That right necessarily includes the right to cross-examine those witnesses. In particular, the right to cross-examination has traditionally included the right to impeach, i.e., discredit the witness.
>
> However, an accused is not simply allowed cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. Indeed, trial

---

(. . . continued)

with [BP], but rather to explore the fact that she had a meaningful relationship with him and what steps she might go to preserve it." However, as the motion can also be read to reach the opposite conclusion, especially in light of the other explicit sexual behavior the defense sought to admit, we first address whether the military judge properly excluded evidence of sexual behavior and predisposition.

> judges retain wide latitude to limit reasonably a criminal defendant's right to cross-examine a witness based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. But no evidentiary rule can deny an accused of a fair trial or all opportunities for effective cross-examination.
>
> Generally, evidence must be admitted within the ambit of [Mil. R. Evid.] 412(b)(1)(C) when the evidence is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice. Relevant evidence is any evidence that has any tendency to make the existence of any fact more probable or less probable than it would be without the evidence. The evidence must also be material, which is a multi-factored test looking at the importance of the issue for which the evidence was offered in relation to the other issues in this case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to that issue.
>
> Finally, if evidence is material and relevant, then it must be admitted when the accused can show that the evidence is more probative than the dangers of unfair prejudice. Those dangers include concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Ellerbrock*, 70 M.J. at 318-19 (internal citations and quotations omitted). In *Ellerbrock*, the victim had previously cheated on her husband. Upon learning of this prior affair, the husband, who described himself as "hot-tempered," reacted violently. Additionally, evidence adduced at Ellerbrock's trial showed that a second transgression may have ended the relationship; a result the victim sought to avoid. Ellerbrock sought to admit evidence of the prior affair to demonstrate that the victim was motivated to fabricate an assault so that her husband would not learn of a second consensual transgression. The CAAF found that such evidence was relevant, material, and should have been admitted. *Id.* at 319-20. ("It is a fair inference that a second consensual sexual event outside a marriage would be more damaging to a marriage than would a single event, assuming the evidence in the record supported that inference.").

However, *Ellerbrock* does not stand for the principle that the mere existence of an ongoing sexual relationship alone is sufficient to pierce the prohibitions of Mil. R. Evid. 412. Any analysis under Mil. R. Evid. 412 is necessarily case-specific. Key to understanding the court's decision in *Ellerbrock* are several facts.

7

First, the relationship in question was a marriage. Second, the defense's theory of the case was that the assault had been fabricated to cover up a *second* incident of infidelity. Third, the victim had a reason to fear her husband would respond violently upon hearing about a second affair. Fourth, the marriage could possibly end if she had again cheated on her husband. As the CAAF makes clear, the defense in *Ellerbrock* laid an extensive evidentiary foundation to demonstrate that *this* victim, *in this* case, had a motive to fabricate the assault and that motive was *material* to the defense's case.

Here, by contrast, the evidentiary foundation is wanting. At the time of the assault and first report, the victim and BP had been in a relationship (well short of marriage) for a few months. There was no evidence of past infidelities, violent reactions, or even the presence of strong emotional bonds at the time of the assault. Additionally, we are unable to discern (and appellant did not explain) how any sexual component to the relationship between 1LT DA and BP was material to the presentation of the defense case. The defense's motion, for example, did not commit to a theory that appellant and 1LT DA had engaged in consensual sexual activity. Thus, in *Ellerbrock*, a specific act of sexual behavior (the victim's prior affair), was admissible, because without it, the factfinder could not understand the circumstances that gave rise to the motive to fabricate. Here, by contrast, the defense did not establish the materiality (or even the relevance) of 1LT DA's possible sexual behavior with BP.

Accordingly, we find the military judge did not abuse his discretion in excluding any references to sexual conduct between 1LT DA and BP.

### 2. Is a "Relationship" Evidence of Sexual Behavior?

As we find the military judge properly excluded any sexual behavior in 1LT DA and BP's relationship, we next address whether the military judge erred when he forbade evidence of *any* relationship. The relevant portion of the military judge's ruling under Mil. R. Evid. 412 was as follows:

> The fact that 1LT [DA] was involved in a relationship with [BP] in January 2012 is inadmissible. There was no evidence presented that others were aware of a consensual sexual encounter between 1LT [DA] and [appellant]. Furthermore, there was no evidence presented that 1LT [DA] feared a jealous rage on the part of [BP], or that she was even concerned as to what his reaction would be. And there was not evidence presented that [BP] would have learned about the alleged sexual assault from anyone other than 1LT [DA].

8

Midtrial, the military judge permitted over government objection the defense to ask BP whether 1LT DA was someone "you cared enough about . . . to find out the details of this alleged assault?  Did you care enough to ask more questions?" BP answered "No."  The defense did not request the military judge reconsider his ruling based on BP's answer.  Military Rule of Evidence 412 prohibits the admission of evidence offered to prove: (1) that the victim engaged in sexual behavior other than the charged offense; and (2) the victim's sexual predisposition.[6]  Mil. R. Evid. 412(a).  The question here is whether evidence of a romantic relationship alone falls within this prohibition.  In other words, if an accused wishes to introduce evidence that a victim was in a dating relationship, and the evidence is otherwise admissible (*see e.g.* Mil. R. Evid. 402 and 403), must the accused also meet one of the exceptions in Mil. R. Evid. 412(b)?  We hold that the accused need not.

To fall under the ambit of Mil. R. Evid. 412, the evidence must be offered to prove either sexual behavior or predisposition.  Mil. R. Evid. 412(a).  A dating or romantic relationship may include sexual behavior, or not.  The position of the government at trial, that all romantic relationships infer sexual behavior, is both dubious and unworkable.[7]  Even today, some relationships abstain from sex.  Moreover, that a victim is in a relationship (or even married) is often part of telling the story (the *res gestae*) even if not amounting to an exception under Mil. R. Evid. 412(b).

Consider a victim-witness who loves another person.  It may be that the witness is biased in favor of this other person, omits details in order to protect this other person, or may be motivated to lie in order to hide painful truths from this other person.  It matters little whether we are talking about the witness' mother or the witness' romantic partner.  In other words, one person's emotional attachment to another person is often fertile ground for examining biases and motives.  That the relationship was romantic instead of maternal does not alter the analysis.  On the other hand, Mil. R. Evid. 412 would likely be triggered if a party tried using sexual behavior (or predisposition) as a proxy for establishing or inferring an emotional connection from which such a bias or a motive might flow.

Evidence of a relationship, even a romantic or dating relationship, absent more is insufficient to create a reasonable inference of either sexual behavior or sexual predisposition that would trigger Mil. R. Evid. 412's exclusions.  Accordingly, we agree with appellant that the military judge erred when he

---

[6] In broad terms, the rule substantially overlaps with Mil. R. Evid. 402, 403, and 404, which provide only logically and legally relevant evidence may be admitted and generally prohibit the admission of propensity evidence.

[7] On appeal, the government's argument appears to be limited to arguing that the evidence of the relationship was not "relevant."

determined that 1LT DA's relationship with BP was inadmissible under Mil. R. Evid. 412.

### 3. Prejudice

That the evidence of a relationship was not prohibited by Mil. R. Evid. 412, of course, does not mean the evidence was admissible. The evidence must be logically (Mil. R. Evid. 402) and legally (Mil. R. Evid. 403) relevant to be admissible. Here, reading between the lines, one could infer the fraternizing nature of 1LT DA's relationship with BP informed the tactical decisions of the parties. Such concerns could also possibly weigh on the military judge when determining whether the probative value of the evidence is outweighed by the danger of unfair prejudice. Mil. R. Evid. 403.

However, neither the parties nor the military judge ever specifically addressed the issue of fraternization. Nor did the military judge articulate a Mil. R. Evid. 403 balancing test. We are, accordingly, left with an undeveloped record as to whether the evidence of a relationship between 1LT DA and BP would have been admitted but for the military judge's erroneous determination that it was excluded under Mil. R. Evid. 412. Accordingly, we will focus the remainder of our analysis on the related issue of whether appellant was prejudiced by its exclusion.

We find the relationship between 1LT DA and BP to have been only marginally relevant and therefore do not find its exclusion to have resulted in a material prejudice to a substantial right of appellant. UCMJ, article 59(a).[8] The defense theory of the case (both in motion practice and at trial) was *that there was no sexual contact at all.* Defense counsel argued, "we're not saying that there was any consensual relationship between Captain Alston and [1LT DA]." That is, the defense theory was that 1LT DA had made up the entire event. First Lieutenant DA testified that appellant called her on 30 January 2012 and invited himself over. The defense introduced phone records to show there was no such call and argued that "it never happened." The defense called 1LT DA's children to demonstrate that while appellant had come over to the house once to fix a television, he had never returned and therefore couldn't have committed the assault. In short, the defense case was not merely that there was no non-consensual assault in 1LT DA's laundry room, but that appellant was not even at 1LT DA's house. The defense called the lead U.S. Army Criminal Investigation Command (CID) Special Agent (SA) assigned

---

[8] Appellant asserts the proper standard of review is whether the error was harmless beyond a reasonable doubt, in part because appellant argues the evidence was "constitutionally required" under Mil. R. Evid. 412(b)(1)(C). Having found the evidence to fall outside of Mil. R. Evid. 412, we need not address whether the evidence meets an exception to Mil. R. Evid. 412. In short, we disagree that this was constitutional error. However, even were we to adopt appellant's standard of review, it would not alter the outcome.

to the case to testify about how 1LT DA requested information about a compassionate reassignment. The defense then argued that evidence as follows:

> [First Lieutenant DA] reports [the assault allegation] [on] 12 July and within ten days or so she is asking Agent Ballard "Hey, does this criminal investigation have to be complete before I request a compassionate reassignment?" Folks, I am here to tell you that I don't always get a motive in these cases, a motive to lie, a motive to fabricate. You all have one. You all have one. You all have one now. Why would somebody make up all these stories about Captain Allston? There is your motive. [First Lieutenant DA], an older lieutenant with three children. She has a life. She admitted that she didn't want to come to Fort Stewart. She had some concrete reasons for it. Her oldest son [E], had some complications with sleep apnea. He had work done at Walter Reed. She wanted to stay in Maryland. She wanted to stay close to Walter Reed. That is what she testified to.

Likewise, on appeal, appellant does not appear to claim that evidence of the relationship was necessary to demonstrate a motive to fabricate to hide a consensual affair with appellant. Rather, and consistent with appellant's trial strategy, appellant argues 1LT DA's relationship with BP explained her motive to "unrestrict" her report of sexual assault.[9] At trial, the defense described this conduct as the "damsel in distress" theory. Specifically, appellant asserted that after 1LT DA and BP broke up, 1LT DA unrestricted her report in order that BP feel sorry for her; hopefully rekindling the relationship. In other words, the asserted relevance of the relationship between 1LT DA and BP, both at trial and on appeal, is in explaining why 1LT DA unrestricted her report of a sexual assault. While appellant labels this as a "motive to fabricate," we do not see it as such.

First Lieutenant DA filed a restricted report of sexual assault on 1 February 2012. In May or June of 2012 she and BP ended their relationship. In July 2012, 1LT DA "unrestricted" her report. Appellant alleges on appeal that 1LT DA "changed her report to unrestricted in an effort to get [BP's] attention, gain his sympathy, and get back together." Appellant claims to this court that evidence of the relationship between 1LT DA and BP "was essential to proving her motive to

---

[9] Appellant also appears to assert that the military judge's ruling prevented appellant from cross-examining 1LT DA on her prior untruthful statements where she denied or omitted a relationship with BP. However, the military judge specifically allowed appellant to cross-examine 1LT DA on these points, stating "I believe from a constitutional right standpoint of the accused in being able to protect his rights, he has the right to explore that."

fabricate" because "[w]ithout that testimony, the panel had no context for the timing of 1LT DA's report from restricted to unrestricted and her reason for doing so." Other than the rough chronology, there was little evidence to support the defense's assertions about why 1LT DA unrestricted her report.

As a matter of logic, 1LT DA cannot develop in May a motive to fabricate a report that she had already made earlier that year in February. Thus we do not see appellant's arguments as reasonably asserting a motive to fabricate. Rather, we understand appellant's argument to be that 1LT DA's broken relationship with BP was her motivation in *pursuing* the allegation of sexual assault. That is, this is a motive to *prosecute*, not a motive to *fabricate*. There is only marginal relevance in a victim's motive in pursuing the prosecution of a crime when there is no material connection to whether the offense occurred. That is, even if appellant is correct and 1LT DA unrestricted the report in July in order to rekindle a relationship with BP, that has little bearing on whether the allegations made in February were true. Accordingly, and given the absence of evidence to support even this inference, we find the exclusion of the evidence of a relationship to be harmless.

Although not pursued on appeal, at trial in their Mil. R. Evid. 412 motion, the defense also argued that evidence of a relationship between 1LT DA and BP was admissible because "to the extent this information gives [1LT DA] motivation to fabricate an assault to hide the *appearance* of a relationship with the accused." (Emphasis added.). At the Mil. R. Evid. 412 hearing, BP testified he was aware appellant and 1LT DA were acquaintances. No party introduced evidence that anyone, let alone BP, thought there was an appearance of a relationship between appellant and 1LT DA. "In short, the right to cross-examine is the right to question where the proffer establishes a real and direct nexus to a fact or issue at hand." *United States v. Sullivan*, 70 M.J. 110, 115 (C.A.A.F. 2011). "There must be a direct nexus to the case that is rooted in the record." *Id.*

Given that the defense strategy was there was no sexual encounter between appellant and 1LT DA, the relationship between 1LT DA and BP was only of marginal relevance to the trial.

*B. Article 13 Credit*

In his next assignment of error, appellant asks this court to find the military judge abused his discretion when ruling on appellant's motion for Article 13, UCMJ credit. Appellant's complaints all stem from a three-month period while he was

awaiting trial and fell under the supervision of a new Brigade Executive Officer, Major (MAJ) Howard.[10]

Broadly, appellant complains he was treated differently than other officers on brigade staff. Specifically, appellant complained at trial he was not given duties commensurate with his rank: he was required to perform physical training with the headquarters company, his requests for pass and leave were denied, and his performance was unduly scrutinized and micromanaged by MAJ Howard.

Recently our superior court decided the case of *Howell v. United States*, 75 M.J. 386 (C.A.A.F. 2016). In that decision, the court made two statements that at first blush appear to be at odds. First, the court stated that to find a violation of Article 13, UCMJ, "[t]he record *must* disclose an intent to punish on the part of the Government." *Id.* at 394 (emphasis added.). That is, a finding of intent is a threshold requirement for finding a violation of Article 13, UCMJ. Consistent with that view, the court specifically rejected the view that a "punitive effect" without finding a punitive intent was sufficient. *Id.* at 393-94. "To the extent that any dicta in *United States v. Fischer*, 61 M.J. 415, 420-22 (C.A.A.F. 2005), suggests that such an effect is sufficient to trigger an Article 13, UCMJ, violation, we reject that view." *Id.*

However, in the very next sentence, the court stated that "[i]rrespective of any intent to punish, Article 13, UCMJ, *is violated* if the activity at issue serves no legitimate, nonpunitive purpose." *Id.* at 394 (emphasis added). That is, just after stating an intent to punish is required, and a punitive effect is insufficient, the court appeared to say just the opposite—there may be an Article 13 violation without a showing of punitive intent.

However, we believe any tension between these statements is easily resolved by looking at the long history of our superior court's case law on Article 13, UCMJ. In short, a violation of Article 13, UCMJ requires proof of an intent to punish. However, as with proof of intent at trial, proof may be through direct or circumstantial evidence. In the absence of *direct* evidence of intent, one may infer *circumstantially* an intent to punish when "the activity at issue serves no legitimate, nonpunitive purpose." *Id.* So understood, *Howell* is consistent with the CAAF's

---

[10] The military judge found that appellant's executive officer told appellant, in reference to the charges, "I can't wait to see you burn for this [sic]." This statement was made in private, and after appellant had tried to surreptitiously record the conversation with his executive officer. The military judge found the executive officer intended to punish appellant when making this comment and awarded thirty days confinement credit pursuant to Article 13, UCMJ. Review of this ruling is not before us. Accordingly, we address appellant's argument that the military judge erred in not awarding credit for the other conduct committed by the executive officer.

decisions stating that "the question of whether particular conditions amount to punishment before trial *is a matter of intent.*" *United States v. Palmiter,* 20 M.J. 90, 95 (C.M.A. 1985) (citing *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)).

Simply put, evidence of intent in the Article 13, UCMJ, context may be shown in the same manner as one might prove intent on the merits at trial: through direct or circumstantial evidence. In a case with direct evidence of an intent to punish, the matter is usually settled. Of course, "direct evidence of intent is often unavailable." Dep't of Army, Pam. 27-9, Legal Services: Military Judge's Benchbook [hereinafter Benchbook] para. 7-3, n.2 (10 Sep. 2014). Thus, circumstantial evidence of an intent to punish may be developed by looking at the conduct of the government actors to discern an intent to punish. Accordingly, the military judge may find an intent to punish by inference when the government's action does not further a "legitimate governmental objective." *Howell*, 75 M.J. at 393. That is, even in cases where the government actor denies an intent to punish, surrounding circumstances may establish the necessary intent.

So understood, we consider the application of *Howell* to this case. When appellant was suspected of misconduct his commander and supervisors faced two independent questions. First, appellant's commander needed to determine how to dispose of the allegations of misconduct. Appellant's commander answered this question by recommending appellant be tried by court-martial. Second, and independently, appellant's leadership needed to determine whether the evidence that supported the misconduct warranted a change in appellant's duties, responsibilities and degree of supervision. If a soldier has lost the trust and confidence of the command to perform certain duties, Article 13, UCMJ, does not stay the commander's hand in retasking the soldier. As a matter of command prerogative, soldiers may be reassigned and retasked based on all matter of considerations; certainly including evidence of misconduct.

The Supreme Court of the United States has stated "courts are ill equipped" to review problems regarding prison administration, and that it is not "wise for [a court] to second-guess the expert administrators on matters on which they are better informed." *Bell*, 441 U.S. at 531 (quoting *Wolfish v. Levi*, 573 F.2d 119 (2nd Cir. 1978)). Military judges are likewise disadvantaged when it comes to reviewing a commander's administration of his or her command. Unless there is an intent to punish, Article 13, UCMJ, does not provide for judicial review of command personnel decisions; even in circumstances where appellant asserts the commander's decision was wrong, misguided, or negligent. What Article 13 prohibits is *extra-judicial* punishment of a person "held for trial." UCMJ, art. 13. This addition reflects not merely the plain language of Article 13, UCMJ, and its interpretive case law, but also the different duties imposed on a commander and a military judge.

When, as here, the accused is of relatively high rank and there is evidence of serious offenses, there may be few duties regularly performed by someone of his

grade for which an accused maintains the command's confidence to perform. Assignment of new or different duties under these conditions, or the increased supervision of the performance of duties, does not violate Article 13, UCMJ, unless it is accompanied by an intent to punish. And, in cases where there is no legitimate government purpose or objective, an intent to punish may be inferred.

Here, the military judge did not find that MAJ Howard had an intent to punish appellant. We agree. There was no direct evidence of an intent to punish, nor was there sufficient evidence to circumstantially establish an intent to punish. Accordingly, we find the military judge did not abuse his discretion in denying that portion of the defense's motion under Article 13, UCMJ.

Finally, even assuming there was an intent to punish, we would need to determine what would be the appropriate amount of sentence credit appellant was due. We do not believe appellant is entitled to any sentence credit for two interrelated reasons.

First, we look to see whether the sentence *as approved* resulted in a material prejudice to a substantial right. UCMJ, art. 59(a) ("A . . . sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial right of the accused."). This view was the approach of our superior court in *United States v. Villamil-Perez*, 32 M.J. 341, 343 (C.M.A. 1991). There, the CAAF found an Article 13, UCMJ, violation when the command posted a report of the accused's offense on a bulletin board for everyone to read. While the CAAF found this conduct to have violated Article 13, UCMJ, the court awarded no credit because there was no material prejudice as a result of his pretrial punishment. *Id.* Assuming a violation of Article 13, UCMJ, appellant has not suffered a material prejudice to a substantial right.

Second, and relatedly, courts have awarded Article 13, UCMJ, credit to ensure an accused is not doubly punished. That is, if the accused has already been punished pretrial, that pretrial punishment must be credited against the sentence. *United States v. Ruppel*, 49 M.J. 247, 254 (C.A.A.F. 1998) ("The power of military judges to grant sentence credit for pretrial confinement and restraint tantamount to confinement is a judicially-created remedy, adopted by this Court under our supervisory powers to enforce Article 13, UCMJ."). This reasoning is why a violation of Article 13, UCMJ, results only in a sentence "credit," not a sentence reduction. *See United States v. Rock*, 52 M.J. 154 (C.A.A.F. 1999); *Ruppel*, 49 M.J. at 254 ("[t]he credit itself is not a reduction of the sentence.") (Effron, J. concurring). It is also why a military judge may award more than day-for-day credit when necessary to balance the accounts in light of egregious conduct. Thus, in *United States v. Suzuki*, it was necessary to award more than day-for-day credit, because a single day for day would have been insufficient to make the accused whole. 14 M.J. 491, 492 (C.M.A. 1983) (condoning three-for-one credit because of "unusually harsh circumstances").

15

In short, when translating an Article 13, UCMJ, violation into a sentence credit, the military judge must ensure the accused has not been twice punished for the same offense, and ensure the resulting sentence does not constitute a material prejudice to the accused's rights.[11]  However, *de minimus* violations do not require administrative credit.  *United States v. Corteguera*, 56 M.J. 330, 333 (C.A.A.F. 2002) (where the pretrial confinee was made to sing "I Believe I Can Fly" and to run from window to window in the jail yelling, "I'm an inmate and I'm here because I can't get it right" constituted "*de minimus*" impositions for which "administrative credit was not required.").

Here, even assuming an Article 13, UCMJ, violation, we would not award appellant with any credit toward his sentence.  Appellant's complaints, such as being ordered to perform physical training with the headquarters company, even assuming they amounted to punishment, did not result in a circumstance where sentence credit is due.

### C. Multiplicious Charges

As noted above, appellant assaulted two security guards at the Circus Circus Hotel and Casino.  Appellant pleaded guilty to two specifications of assault consummated by battery.  For that same conduct, Specification 3 of Charge III alleged that appellant "physically assault[ed] Mr. SS and Mr. BC in the women's restroom of a casino, and that, under the circumstances, these acts . . . constituted conduct unbecoming an officer and a gentleman."  In other words, the specification alleged that appellant had committed the offense of an assault and battery, but with the additional element that his conduct was unbecoming.

We specified the issue of whether the offenses were multiplicious.  In response, the government conceded error and requested that we dismiss the conduct unbecoming offense.[12]

As alleged, every element of the assault and battery offenses was included in the conduct unbecoming offense.  In case there was any doubt, when instructing on the element of "assault" contained in the conduct unbecoming offense the military

---

[11] We do not mean to imply that determining Article 13, UCMJ, credit is a matter of mathematics.  Translating illegal pretrial punishment into a sentence credit will often be a matter of judgment, for which military judges are justly given substantial discretion.  *See generally United States v. Zarbatany*, 70 M.J. 169 (C.A.A.F. 2011).  As a remedial credit, the focus is on making the accused whole, not on punishing government behavior.

[12] At trial, the government objected to the offenses being merged even for sentencing.  We welcome and accept the government's concession on appeal.

judge explained the elements of "assault" only by incorporating them by reference to the specifications that alleged assault consummated by battery.

Accordingly, the two assault consummated by battery offenses are lesser included offenses of the Article 133 offense of conduct unbecoming an officer and a gentleman. That is, they are not merely unreasonably multiplied, they are multiplicious. "The prohibition against multiplicity is necessary to ensure compliance with the constitutional and statutory restrictions against Double Jeopardy. . . ." *United States v. Quiroz*, 55 M.J. 334, 337 (C.A.A.F. 2011); *see also United States v. Campbell*, 71 M.J. 19, 23 (C.A.A.F. 2012) ("[W]e now explicitly hold that there is only one form of multiplicity, that which is aimed at the protection against double jeopardy as determined using the *Blockburger/Teters* analysis."). Both charges cannot stand. Accordingly, and consistent with the government's election, we will dismiss Specification 3 of Charge III.

## CONCLUSION

Specification 3 of Charge III is set aside and DISMISSED. The remaining findings of guilty are AFFIRMED.

We note that the military judge merged Specification 3 of Charge III with Specifications 1 and 2 of Charge II for purposes of sentencing. Reassessing the sentence on the basis of the error noted, the entire record, and in accordance with the principles of *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013), we AFFIRM the sentence. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings set aside by this decision, are ordered restored.

Senior Judge MULLIGAN and Judge FEBBO concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

17